STATE, Respondent, v. HOYT, Appellant.*

*April 3—June, 5, 1964.*

* For prior opinion filed October 29, 1963, see post, p. 310. Reporter.

286

For the appellant there was a brief and oral argument by *Philip L. Padden* and *Herbert S. Bratt,* both of Milwaukee.

For the respondent the cause was argued by *William A. Platz,* assistant attorney general, with whom on the brief were *George Thompson,* attorney general, and *Robert D. Martinson,* assistant attorney general.

The following opinion was filed June 5, 1964:

PER CURIAM (*on rehearing*). The opinion of the court, filed October 29, 1963, is hereby withdrawn. The following opinion is substituted in its place.[2]

William Hoyt died at his home between °6 and 7 p. m., May 28, 1962. He had been shot by his own revolver, then in the hand of his wife, Dona Hoyt. She was charged with second-degree murder, and convicted.

At the trial, Mrs. Hoyt requested that the jury be instructed with respect to manslaughter and that an appropriate form of verdict be submitted. She objected to receipt in evidence of a written confession. She objected to testimony of police officers of their observations within her home after the shooting. She contends that the court erred in refusing to submit a manslaughter verdict, in permitting the confession to go before the jury, and in permitting the officers to testify about what they observed in her home.

1. *Submission of a manslaughter verdict.* Mrs. Hoyt was twenty-nine years of age. Her husband was 6 feet, 3½ inches tall and weighed 235 pounds. Dona was 5 feet, 6½ inches tall and weighed 130 pounds. They had been married for eight years, and had one son, Russell, aged seven. Mrs. Hoyt testified to an unhappy married life, and to frequent incidents where Mr. Hoyt beat or choked her and humiliated her in various ways. A number of these incidents of violence and humiliation were corroborated or described by apparently disinterested witnesses as well as Mrs. Hoyt's parents. On the afternoon preceding the killing, she had gone to a tavern to pick up Mr. Hoyt, and he said several things to her and to others present which need not be repeated here, but were humiliating and insulting.

---

[2] The concurring opinion written by Mr. Justice GORDON and joined in by Mr. Justice HALLOWS has not been withdrawn. See post, p. 317v.

They returned to their home, and the events which occurred there are described only by Mrs. Hoyt. After eating something, both were in the living room. Mr. Hoyt was lying on the davenport, and Mrs. Hoyt sat on the edge of it to talk to him. She asked him whether they couldn't live some other kind of life. He said she could live any kind she wanted, and that he would sell the house, take their son and leave town. He pushed her off the davenport with his legs. Then he got up and pushed her head toward the floor with his hand. Then he stretched out on the floor. She got on her knees, bending over him, and spoke to him. He put his hand on her face and pushed her back so that she fell.

She testified:

"*A.* I got on my knees to him, just bending over him and I said 'Bill, why don't you go to bed now,' I said. And he said 'Why don't you go to Hell,' and he put his hand on my face and pushed me back.

"Well, when he did this I just lost my balance and I ended up away from him, you know, I just fell this way. And then I got up and walked out into the hall and I just wanted to get out of the room and I just felt like I wasn't there— well, it was real foggy, like you can't even look out of the side of your eyes, or something. And I walked into the hall, and, well, I just was afraid to be in there, I didn't know what to do. I couldn't go in the kitchen because he was there and so he could see, and I was afraid he would come after me if I went in the kitchen. And when I was thinking this—I was already past this bedroom, and so I turned into Rusty's room—it was on the side of me and I just turned in and I walked in Rusty's room and I was standing there and I was just staring straight ahead as I walked in. And I saw the door open, it has a mirror on it, and I took my hand and I was going to close the door, and I looked up and my eyes saw this gun. I don't feel like I even reached for it, it just seemed like I was drew to touch that gun and—I mean, in a fog, I wasn't thinking, I wasn't planning, I wasn't doing anything.

"I just reached this gun and I had it in my hands and some leather covering of some sort fell down and I was looking at this gun in my hands, and I was just foggy and I was staring at this gun. And I walked out two steps, I think it was, and I'm out of this room and I was in the hall, and as soon as I realized I was in the hall and I had that gun I quick put it in back of me. And I heard a little noise outside and I walked, turned,—the hall is so small—I turned to the living room and Bill could see me and I was standing with my hands behind my back. And he said 'Have you got a knife—cut me. You got my gun?' And when he said 'gun' I just didn't say anything, and he was coming at me and I put the gun in front and he laid back down and he said 'Shoot, it's not loaded—shoot.'

"And I just was froze there, and I was standing there and he said 'What's the matter, what's the matter now,' he said 'come on, Bitch,' he said 'come on,' he said, 'shoot,' he said 'come on, you bitch, shoot.' And I said 'quiet,' and he said 'shoot, I don't care, I don't care about you, I don't care about kids, I don't care about anything, shoot, shoot, shoot, shoot, shoot!' And his face came at me and it was all red and contorted and I stepped back and it shot, and it was dull, and I thought 'What is that?' and I saw Bill, and at first it looked like he was mad again, but then his face crumpled and I laid down and I said 'Bill, Bill, Oh, Bill!' "

After the shooting she called the police, but hung up before saying anything, apparently because she did not want her parents and son to learn about it that way. She took her son, who had been outside, and drove to her parents' home. Her mother testified that Mrs. Hoyt came to the door and asked her to promise to take care of Russell; that she must have been in a complete state of shock, staring, with her eyes wide open. The parents surmised there must have been another quarrel, but had some difficulty in finding out what had happened. When they finally learned that Mr. Hoyt had been shot, Mrs. Hoyt indicated she wanted to go back and shoot herself. She did not remember pulling the trigger,

but remembered having the gun in her hand and shaking, and Mr. Hoyt telling her to go ahead and shoot. She told her mother of the argument and humiliation that afternoon in the tavern.

Mrs. Hoyt's parents called the police.

In not charging Mrs. Hoyt with first-degree murder, the state apparently conceded that her state of mind was such that she lacked "intent to kill" (mental purpose to take the life of another).[3] She was guilty of second-degree murder if she caused her husband's death "by conduct . . . evincing a depraved mind, regardless of human life."[4] She contends that, under the evidence, a jury could have entertained a reasonable doubt but that she caused his death "Without intent to kill and while in the heat of passion," the specification for one type of manslaughter.[5]

"That which will constitute 'the heat of passion' which will reduce what would otherwise be murder to manslaughter 'is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or reck-lessness of disposition.' *State v. Stortecky* (1956), 273 Wis. 362, 372, 77 N. W. (2d) 721. It has been said that ' "the provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror." ' 21 Am.

[3] Sec. 940.01, Stats.
[4] Sec. 940.02, Stats.
[5] Sec. 940.05 (1), Stats.

& Eng. Ency. of Law (2d ed.), p. 177, quoted in *Johnson v. State* (1906), 129 Wis. 146, 159, 108 N. W. 55." [6]

We have recently said:

"Thus, with respect to provocation, the test applied is not the subjective one of whether it was sufficient to produce in defendant such passion as to cause him to kill without intent to do so. Rather it is the objective one of whether the provocation would have caused such state of mind in persons ordinarily constituted." [7]

If Mrs. Hoyt's testimony be believed, it could readily be found that her acts resulted from an emotional or mental disturbance produced by her husband's provocative conduct. In terms of the standards for heat-of-passion manslaughter, the question would remain whether the provocation offered would be sufficient in character and degree to cause the same result in an ordinarily constituted person.

If we look solely at the action of Mr. Hoyt in the last few minutes before the shooting, it seems clear that such actions would not be sufficient to produce the required degree of disturbance in an ordinarily constituted person not previously subjected to the treatment visited upon Mrs. Hoyt by her husband and disclosed by the record. On the other hand, it seems reasonable that the treatment to which Mrs. Hoyt had been subjected for a long period of time, and the public humiliation of her within the previous hour would have a cumulative effect upon any ordinary person so that the provocation just before the shooting would be greatly magnified.

Under the peculiar circumstances of this case, we conclude that a jury might properly have found her guilty of heat-of-

[6] *Zenou v. State* (1958), 4 Wis. (2d) 655, 666, 91 N. W. (2d) 208.

[7] *Brook v. State* (1963), 21 Wis. (2d) 32, 42, 123 N. W. (2d) 535.

passion manslaughter and entertained a reasonable doubt of her guilt of second-degree murder, and that the manslaughter verdict should have been submitted.

2. *The written confession.* A three-page statement, written and signed by Dona Hoyt, was presented by the state. The court heard testimony, in the absence of the jury, concerning the circumstances under which it was prepared, and concluded that it had not been clearly shown to be testimonially untrustworthy. Virtually the same testimony was then produced before the jury; the statement was received in evidence; and the jury was instructed to consider the statement only if satisfied beyond a reasonable doubt that it was freely and voluntarily made.

Police officers picked up Mrs. Hoyt at her parents' home. She made no statements on the way to headquarters, and reached there about 8:45 p. m. Some time was consumed in identification processes, and she was questioned from 10:15 until nearly midnight. Although Officer Obst testified that she was unwilling to answer certain questions, and did not admit or deny shooting her husband, it is apparent that she related many of the facts to him during that period.

Around midnight, she was permitted to talk with her parents. They told her she should co-operate with the police, and she asked her father to obtain a lawyer. After her parents left, she was interviewed by Sergeant Hagopian and she evidently told him her complete version of events. She refused, however, to make a statement in the presence of a stenographer and asked Hagopian to telephone her father. She talked with her father about 1:30 a. m. and he told her not to sign anything until he could contact an attorney. Through a friend, he got in touch with Attorney Raskin, and then conveyed Mr. Raskin's advice to Mrs. Hoyt and Sergeant Hagopian. Mrs. Hoyt and her father both testified that he advised Mrs. Hoyt not to sign anything. Sergeant Hagopian conceded only that she had been advised against

making a statement with a stenographer present, and drew a distinction between that, which he referred to as a "formal" statement, and a statement written out and signed by her.

About 3:10 a. m., she began writing a statement and completed it at about 4:15 or 4:30. The statement differs from her testimony at trial in very few respects.

There is some difference between the testimony of Mrs. Hoyt and of Sergeant Hagopian with reference to the circumstances under which the statement was given.

Mrs. Hoyt testified that Sergeant Hagopian told her that without a written statement the district attorney would charge first-degree murder, but if she co-operated the police would recommend second-degree murder or manslaughter; that her lawyer did not realize all the facts and that if the lawyer were there Sergeant Hagopian was sure the lawyer would agree that she should sign; that another officer indicated the next shift would be taking over and that if she did not sign, she would not get any sleep; that she told Sergeant Hagopian she was sick at her stomach. Her written statement concluded: "If I've left out anything its because I'm so tired and sick." She conceded there was no mistreatment, she was permitted to smoke, and was offered food.

Sergeant Hagopian denied saying she would be charged with murder in the first degree if she did not sign and second degree if she did. With respect to illness, he conceded only that she said she had a slight headache. Although he testified she told him she would be willing to write a statement, he admitted that he had asked her to do so three or four times. He did tell her her case would be presented to the district attorney, but he denied referring to first or second-degree murder or manslaughter.

It is evident from the testimony of both that she wrote the statement very slowly, and paused frequently.

As we read the recent decisions of the supreme court of the United States in this area, the constitutional question is

broader than whether a defendant's statement in response to police request was so much the product of coercion as to be untrustworthy.[8] For other reasons of policy, voluntariness, in this context, must include a considerable deliberateness of choice.[9] The court has recognized a distinction between the search for information in the process of investigation and the creation of written or otherwise recorded evidence for use against the accused upon his trial.[10] In the latter situation, the supreme court particularly insists that deliberateness of choice must appear in order to save the statement from constitutional taint.[11] Thus the supreme court appears to approach a concept that an accused has a constitutional privilege against providing evidence against himself in advance of trial.

Upon review of the record, we hold that the writing of the statement was not Mrs. Hoyt's free and deliberate choice. Although all the circumstances have been considered, two propositions seem to us of special weight. One is the very high probability that the lateness of the hour and the prospect of being deprived of sleep were important factors in

[8] *Rogers v. Richmond* (1961), 365 U. S. 534, 540, 81 Sup. Ct. 735, 5 L. Ed. (2d) 760; *Blackburn v. Alabama* (1960), 361 U. S. 199, 206, 80 Sup. Ct. 274, 4 L. Ed. (2d) 242; *Spano v. New York* (1959), 360 U. S. 315, 320, 79 Sup. Ct. 1202, 3 L. Ed. (2d) 1265.

[9] *Haynes v. Washington* (1963), 373 U. S. 503, 83 Sup. Ct. 1336, 10 L. Ed. (2d) 513; *Townsend v. Sain* (1963), 372 U. S. 293, 307, 83 Sup. Ct. 745, 9 L. Ed. (2d) 770; *Lynumn v. Illinois* (1963), 372 U. S. 528, 534, 83 Sup. Ct. 917, 9 L. Ed. (2d) 922; *Shotwell Mfg. Co. v. United States* (1963), 371 U. S. 341, 347, 83 Sup. Ct. 448, 9 L. Ed. (2d) 357; *Gallegos v. Colorado* (1962), 370 U. S. 49, 82 Sup. Ct. 1209, 8 L. Ed. (2d) 325; *Culombe v. Connecticut* (1961), 367 U. S. 568, 81 Sup. Ct. 1860, 6 L. Ed. (2d) 1037; *Reck v. Pate* (1961), 367 U. S. 433, 440, 81 Sup. Ct. 1541, 6 L. Ed. (2d) 948; *Rogers v. Richmond, supra,* footnote 8; *Blackburn v. Alabama, supra,* footnote 8; *Spano v. New York, supra,* footnote 8.

[10] *Haynes v. Washington, supra,* p. 515, footnote 9; *Culombe v. Connecticut, supra,* footnote 9.

[11] *Spano v. New York, supra,* p. 323, footnote 8.

inducing her to make the statement after repeatedly refusing to do so. Even more important is the fact that her change of mind was produced by repeated requests of the police officer in disregard of the advice of her attorney. Whatever the exact words in which such advice was communicated to her and to Sergeant Hagopian, the distinction he drew between making a "formal" statement and writing out a statement is not impressive.

The court of appeals of New York has recently held that the law of that state requires "the exclusion of a confession taken from a defendant, during a period of detention, after his attorney had requested and been denied access to him." [12] We need not decide that exact question here. It is conceivable that Mrs. Hoyt could have made a free and deliberate decision to disregard her attorney's advice, but upon this record the state has shown no reasonable basis for concluding that she did so.

Upon the record made in an attempt to lay a foundation, the confession should have been excluded.

3. *The search.* Mrs. Hoyt's mother telephoned the police and reported that there had been a shooting at the Hoyt home. A police ambulance squad was sent to that address. The officers rang the front and rear doorbells, but received no answer. Through a window they saw what appeared to be a body on the living room floor. They opened the rear door, which was unlocked, and asked if anybody was home. They went through the kitchen and hallway and saw Mr. Hoyt's body. At this point in the testimony of one officer, defense counsel objected to the testimony because the officers entered without consent or a warrant, and no facts had been shown to permit entry without a warrant.

The court overruled the objection because it was untimely and because there was a situation justifying entry.

[12] *People v. Donovan* (1963), 13 N. Y. (2d) 148, 193 N. E. (2d) 628, 629.

The officer then described his observations of the body, the gun lying near it, and the rooms, his call to headquarters, the taking of pictures, and the removal of the body. The gun and pictures were later received in evidence, most of them without objection.

It may well be that the court's ruling could be sustained solely on the ground that the objection was untimely. Sec. 955.09 (3), Stats., provides:

"Defenses and objections based on . . . the use of illegal means to secure evidence (except confessions) must be raised before trial by motion or be deemed waived. But the court may, in its discretion, entertain such motion at a later stage of the trial, in which case the defendant waives any jeopardy that may have attached. A motion to suppress evidence shall be so entertained, with waiver of jeopardy, when it appears that defendant is surprised by the state's possession of such evidence."

In any event we conclude that the court's ruling was proper on the second ground specified. The Fourth amendment to the constitution of the United States and sec. 11, art. I of the constitution of Wisconsin guarantee security of houses "against unreasonable searches and seizures." The officers had received information of a shooting at this address. They were able to see a body on the floor within. No one answered their rings. Under these circumstances it was their duty to enter at least for the purpose of determining whether the body was alive or dead, and to render assistance if alive.

It has been recognized, sometimes in dictum, that emergency situations may present compelling reasons for an immediate search without warrant, which may nevertheless be reasonable.[13] A search incident to arrest is the most

---

[13] *Carroll v. United States* (1925), 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543; *Johnson v. United States* (1948), 333 U. S. 10, 68 Sup. Ct. 367, 92 L. Ed. 436; *Steeber v. United States* (10th Cir. 1952), 198 Fed. (2d) 615, 33 A. L. R. (2d) 1425; *District of*

commonly recognized instance of a reasonable search without a search warrant.[14]

In the instant case the purpose of assisting the victim if still alive supplied a compelling reason for immediate entry, quite apart from the purpose of prosecuting for crime. In civil cases where a fireman or policeman attempts recovery for being injured upon private property in the course of performing a duty, he is held not to be a trespasser.[15] Where a conflagration is raging, a person may lawfully enter upon another's premises in order to save others, and he is not regarded as a trespasser.[16] In other situations necessity, especially in the interest of preservation of human life, will legally excuse or justify trespass.[17]

We conclude that in the present case the officers lawfully entered the home and their observations incidental to lawful entry did not constitute an unreasonable search.

It appears that ultimately they made a complete search of the house and the state argues that this was also reasonable because of the possible presence of the person who had done the shooting or of some other victim. The reasonableness of the complete search need not be determined, however, because the evidence offered, except for four photographs, consisted only of the gun which was found near the body and of pictures of the areas which the officers observed while going to the body. The four photographs referred to depicted two

*Columbia v. Little* (D. C. App. 1949), 178 Fed. (2d) 13, 13 A. L. R. (2d) 954; *Ellison v. State* (Alaska, 1963), 383 Pac. (2d) 716, 720; *Eisentrager v. State* (Nev. 1963), 378 Pac. (2d) 526.

[14] *United States v. Rabinovitz* (1950), 339 U. S. 56, 60, 70 Sup. Ct. 430, 94 L. Ed. 653.

[15] Anno. Policeman or Fireman—Injury, 86 A. L. R. (2d) 1205; *Anderson v. Cinnamon* (1955), 365 Mo. 304, 282 S. W. (2d) 445; *Krauth v. Geller* (1960), 31 N. J. 270, 157 Atl. (2d) 129; *Burroughs Adding Machine Co. v. Fryar* (1915), 132 Tenn. 612, 179 S. W. 127.

[16] 22 Am. Jur., Fires, p. 630, sec. 53.

[17] 52 Am. Jur., Trespass, p. 867, sec. 40.

other rooms, but defense counsel offered no objection to them.

If, on the new trial, other evidence be offered, the question will be open for determination whether the objection has been waived under sec. 955.09 (3), Stats., or whether the search which led to the offered evidence exceeded legitimate bounds.

We confirm our original mandate, reversing the judgment. There is to be a new trial consistent with this opinion.

WILKIE, J. (*concurring*). While I concur in the opinion of the majority of this court that Dona Hoyt is entitled to a new trial because an alternative verdict of manslaughter should have been submitted to the jury and because her involuntary confession was admitted into evidence against her, I must note my disagreement, in part, with the majority's reasoning upon which this result is predicated.

## THE MANSLAUGHTER VERDICT.

The majority retains the "objective," provocation-sufficient-to-enrage-the-ordinarily-constituted-man test, to determine whether conduct ordinarily deemed first or second-degree murder could properly be regarded as manslaughter within the meaning of sec. 940.05 (1), Stats.[1]

Applying the test to the circumstances of this case, the court concludes that a manslaughter verdict should have been submitted to the jury.

In my view, the traditional test creates many problems which lead to the conclusion that the ordinarily constituted man formula does not deal with the issue posed by the re-

---

[1] "940.05 MANSLAUGHTER. Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years: (1) Without intent to kill and while in the heat of passion; or . . ."

quest to submit a manslaughter verdict in a prosecution for first or second-degree murder. I would reject the traditional test and replace it with another formula which gives effect to the legislative gradation of homicide set forth in ch. 940, Stats.

Sec. 940.05 (1), Stats., provides that homicide, which would otherwise be first or second-degree murder, shall be deemed manslaughter if committed "without intent to kill and while in the heat of passion." What is the meaning of "intent to kill" within this section? Generally, an intention to kill means that a person has consciously chosen to destroy another, and has purposively directed his conduct to that end.[2]

However, as the assistant attorney general has noted in argument, a finding that a defendant was adequately provoked, irrespective of the test applied, is legally equivalent to a finding of no intention to kill within the meaning of sec. 940.05 (1), Stats. Therefore, even though in *fact* a defendant consciously chose to kill another, and purposively directed his conduct to that end, if the victim's conduct would have provoked the ordinarily constituted man to follow the same course of action, the defendant is guilty of manslaughter and not murder.

That this analysis of the meaning of "without intent to kill" expresses the legislative purpose of this section, can be determined by reference to a law-review article in the Wisconsin Law Review, written by Assistant Attorney General William A. Platz, a member of the advisory committee which participated in the drafting of the Criminal Code. This court has held that an article in a scholarly publication by a member of a bar advisory committee which participated in the formulation of a broad comprehensive piece of legislation,

---

[2] Sec. 940.01 (2), Stats.
Judiciary Committee Report on the Criminal Code (1953), 58.

may be treated as an authoritative statement of legislative intention.[3]

In this article relating to the substantive portions of the 1956 Criminal Code, Platz noted:

"Manslaughter (which covers only 'voluntary' killings) may be committed under four circumstances set forth in section 940.05. The first, 'heat of passion,' was fully codified in 1953, but this was changed in the 1955 draft so that it will be necessary to consult the case law for the definition of the term. The *fiction* that 'heat of passion' negates an intent to kill was abandoned in the 1953 code (which treated manslaughter as murder mitigated by circumstance) but has been written back into the law. Distinctions based on the manner of the killing are abolished." (Emphasis added.) [4]

Therefore, the legislature intended a finding of adequate provocation to be *legally* coextensive with a finding of no intention to kill, even though *factually* the defendant consciously and purposively took the life of another.

In the legislative scheme of gradation of homicide, manslaughter is a mitigated verdict, following upon a demonstration that the defendant is less blameworthy than others who commit murder.

The issue before the court in this litigation is: What test of provocation gives effect to the legislative gradation of homicide, on the basis of the moral blameworthiness of the defendant?

The majority would retain the "ordinarily constituted man" or the "reasonable man" test of provocation. Yet critical issues in the administration of even this test remain

---

[3] *Wisconsin Valley Improvement Co. v. Public Service Comm.* (1959), 7 Wis. (2d) 120, 95 N. W. (2d) 767; *Muench v. Public Service Comm.* (1952), 261 Wis. 492, 53 N. W. (2d) 514, 55 N. W. (2d) 40.

[4] Platz, The Criminal Code, 1956 Wisconsin Law Review, 350, at page 370.

unanswered. The "reasonable man" concept in the law generally has two distinct meanings. There is the statistical concept under which the reasonable man does what most people do in fact under the circumstances. Yet if this is the meaning of the test, it is clear that as a matter of fact a great majority of people will never commit murder no matter how violently provoked by another. A consistent application of this test, viewing the reasonable man as the statistical *factual* norm would, in effect, read sec. 940.05 (1), Stats., out of existence.

However, in other contexts, there is the ethical concept under which the reasonable man functions as the person the law *expects* everyone to be, regardless of whether a majority, in fact, fall short of the *moral* norm in actual conduct. To take this view of the reasonable man for the purposes of the provocation test would propel courts and juries into the strange task of deciding when a person, taken as the ethical ideal, would commit murder. This may well result in reading sec. 940.05 (1), Stats., out of existence. The person we *expect* people to be like would not likely solve his problems by murder. If we conclude that an ethical ideal—that person whom all others aspire to emulate—would be driven to kill under the circumstances of a given case, logically the verdict should be not guilty, not morally blameworthy to any degree. Again, manslaughter, as conduct less blameworthy than nonprovoked intentional killing but not guiltless, is practically eliminated from the code.

This analysis brings me to the heart of my disagreement with the majority. The objective, the "ordinarily constituted man" or the "reasonable man" test leads juries and courts into inquiries which are not relevant to the issue at hand. In assessing the manslaughter defense to a charge of a more serious homicide, we are not concerned with how most people would act under the circumstances of the case, nor

are we concerned with what the defendant "ought" to have done comparing him with the morally ideal response under the circumstances. The "ought" question is answered by the presence of sec. 940.05 (1), Stats. The manslaughter defense assumes that the defendant is morally blameworthy to some degree. The basic question is whether he is as culpable as a person who kills solely for self-aggrandizement or out of sheer malevolence. To answer this question, we must place ourselves empathetically in the actual situation in which the defendant was placed, a situation which may be relatively unique. Therefore, an inquiry into what *most* people would do in such circumstances cannot be completely determinative of the issue. The test cannot be wholly objective or wholly subjective. A person may become filled with murderous hate for another which can be discharged only by acting out the feeling and killing that person. The victim's conduct, in relation to the defendant, from the point of view of most people, may have been neutral if not benign. The sheer intensity of the defendant's hostile feeling cannot alone justify the manslaughter verdict. The victim's conduct must be such that we conclude that the feeling and conduct of the defendant can be understood sympathetically, albeit not condoned. The trier of fact must be able to say, "although I would have acted differently, and I believe most persons would have acted differently, I can understand why this person gave way to the impulse to kill. He is different from the person who kills for personal gain alone."

To come to this judgment, the trier of fact must focus upon the defendant's total life experience in relation to the victim, and attempt to understand, in emotional as well as cognitive terms, the defendant's feelings toward the victim. Under the wholly objective test, the defendant's state of mind immediately before the act of homicide, and the victim's conduct at this precise moment, are the crucial objects of inquiry. Although the majority notes that the prior ex-

perience of the defendant and victim in relation to one another is relevant to the state of mind of the defendant at the moment of the homicide, the objective test shifts the focus of inquiry in a manner which is misleading. The total life experience of the defendant in relation to the victim determines the justification of the lesser verdict. As the majority notes, the act of homicide may be the culmination of a pattern of pressures of long duration. That the defendant may have been less angry with the victim at the moment of murder than at some time in the past (when he checked the impulse to kill) is irrelevant, if the trier of fact can conclude that, given the total experience of the defendant with the victim, the act of violence can be understood in terms which lessen the defendant's blameworthiness.

The instances in which the issue of manslaughter or a more serious offense is sharply posed, are relatively predictable. Outside of murder for personal gain or murder by organized criminals, most homicides involve one family member killing another, against a background of personal insult, humiliation, and bullying, such as is present in the instant case. It is important that the legal standards defining the dimensions of the crime and defenses and thereby determining the relevancy and probative worth of lines of evidence and modes of argument, focus the attention of the trier of fact upon the basic issues. By providing gradations of intentional homicide, the legislature has announced that not all persons who consciously and purposively kill another are equally blameworthy. Some person's act of homicide can be understood as a very human response to a desperate condition.

The wholly objective ordinarily constituted man test, by failing to take account of the emotional dimensions of a concrete individual's specific situation, fails, in my view, to define sharply the issue posed by the legislatively provided manslaughter defense.

The provocation test formulated in the Model Penal Code of the American Law Institute, I believe, gives proper weight to all relevant factors. It is neither wholly objective or wholly subjective. Under the Model Penal Code, a homicide which would be ordinarily first or second-degree murder will be deemed manslaughter if "committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be." [5]

This test would enable the trier of fact to evaluate the defendant's conduct in a specific situation. The trier of fact is called upon to determine a degree of blameworthiness. This task cannot be accomplished by means of either a wholly objective or wholly subjective test. The Model Penal Code formulation permits the trier of fact to decide "whether the actor's loss of self-control can be understood in terms that arouse sympathy enough to call for mitigation in the sentence." [6] This is the critical issue surrounding the manslaughter defense. I would adopt the Model Penal Code formulation as the test of provocation under sec. 940.05 (1), Stats.

Although I would prefer the adoption of the test set forth herein in connection with the submission of an alternative manslaughter verdict, even with the rejection of this suggested test I concur with the opinion of the majority that it was error not to submit the alternative verdict of manslaughter and that this error constitutes one reason for granting a new trial.

---

[5] Model Penal Code, p. 126 sec. 210.3 (1) (b) (Official Draft, 1962).

[6] Model Penal Code, Comment, p. 48 (Tentative Draft No. 9, 1959).

## THE CONFESSION.

*Scope of Review and Role of Judge and Jury.*

The majority's disposition of this issue implicitly raises certain procedural and administrative issues dealing with the relationship between jury, trial court, and appellate court, which should be explicitly resolved. Specifically, what is the scope of review by this court of a trial court's determination that a given confession was made voluntarily, and in what respect does a jury's evaluation of a confession differ from that of a trial court?

As to the first question, as the majority states, in determining whether a confession was coerced, and its admission into evidence against a defendant was therefore a denial of the Fourteenth amendment due process, this court must apply federal constitutional law. Under federal law the resolution of this question is a *three-stage* process involving a variable scope of review on at least two of the stages.[7]

1. The historical physical facts surrounding the interrogation must be determined. On these matters, the appellate court is bound by the trial court's findings if supported by credible evidence. Direct conflicts in testimony must be resolved in favor of the view which supports the trial court's determination of voluntariness or involuntariness.

2. The defendant's psychological response to these physical facts must be determined. To be admissible, the confession must be the product of a "free and unconstrained will."[8] Whether the defendant voluntarily made the confession is a matter of fact. However, it is a question of "constitutional" fact which must be independently deter-

---

[7] *Culombe v. Connecticut* (1961), 367 U. S. 568, 81 Sup. Ct. 1860, 6 L. Ed. (2d) 1037.

[8] *Haynes v. Washington* (1963), 373 U. S. 503, 514, 83 Sup. Ct. 1336, 10 L. Ed. (2d) 513.

mined by this court.[9] A finding of voluntariness is a necessary condition of the use of a confession as evidence by the state, as a matter of federal constitutional law.

The scope of constitutional protections, representing the basic value commitments of our society, cannot vary from trial court to trial court, or from jury to jury. Reasonable men can differ as to whether a given confession was voluntary. Whatever the ultimate substantive dimension of these rights might be, they must be uniform throughout the jurisdiction. This can be accomplished only if one decision maker has the final power of independent determination. It is the task of this court to determine the voluntariness of a confession by applying certain standards articulated by the United States supreme court to the facts of the given case.

3. The application of these standards, outlined in the cases cited by the majority, to the given facts is the third stage of the process.

This three-stage process is implicit in the majority's disposition of this case. For the sake of future guidance to trial courts, I would simply urge that the analysis be made express.

The trial court and the jury have distinctly different tasks in evaluating a confession. The trial court must determine competency, the jury determines probative value. The trial court determines voluntariness (not trustworthiness) in terms of the Fourteenth amendment standards defined by the United States supreme court. This determination is a precondition of admissibility. Its conclusion is a determination of law appealable by either party.

The jury, on the other hand, must assign probative value to the confession as evidence. A voluntarily given confes-

---

[9] *Culombe v. Connecticut, supra.* See also *Manual Enterprises, Inc., v. Day* (1962), 370 U. S. 478, 488, 82 Sup. Ct. 1432, 8 L. Ed. (2d) 639: "That issue [whether a publication is 'obscene'], involving factual matters entangled in a constitutional claim . . . is . . . one for this Court. The relevant materials being before us, we determine the issue for ourselves."

sion may be wholly false. The emotionally disturbed person who "confesses" to a crime he did not commit is an illustration. Although those factors affecting the *voluntariness* do also affect *weight,* the two concepts are not coextensive. The probative weight of the confession has no bearing on its voluntariness under the standards articulated by the supreme court. Conversely, as noted above, voluntariness though relevant is not determinative of weight. Therefore, the trial court should instruct the jury that their *only* task is to consider weight, and they may consider voluntariness only as it affects probative value.

## *What Determines Voluntariness of Confession?*

What then are the standards by which the voluntariness of a confession may be assessed? The United States supreme court has identified certain factors, which while not in themselves determinative, in combination lead to the ultimate conclusion of coercion or voluntariness. What is needed is a consistent rationale for confession cases which demonstrates the relevance, possible weight, and interrelationship of various factors, and provides a systematic basis for reasoned application of these standards to concrete fact situations. The majority offers a manifestly reasonable and perceptive analysis of United States supreme court decisions, suggesting that the highest court has approached the concept of extending the Fifth amendment privilege against self-incrimination at trial to certain proceedings in advance of trial, including confessions. While this analysis can reasonably account for many United States supreme court decisions, I feel an alternative and broader approach is more consistent with the articulated basis of decision in many of these cases. Choosing an alternative approach necessarily means that I emphasize different factors than the majority in coming to the same conclusion that Dona Hoyt's confession was coerced.

The essence of the United States supreme court's approach to confession cases, in my view, lies in the following statement:

"Our decisions under that Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, *i.e.,* the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." [10]

If a confession is to be the product of the free and unconstrained will of the defendant it is important that under the totality of circumstances in which the confession is obtained, the defendant is not the victim of a conspicuously unequal confrontation in which the pressures brought to bear on him by representatives of the state exceed the defendant's ability to resist.

On the resistance side of the equation, the following factors become relevant: the defendant's age,[11] mental ability,[12] education, and emotional condition at the time of interrogation,[13] and prior experience with the police.[14] On the pressure side, the length of interrogation,[15] use of

[10] *Rogers v. Richmond* (1961), 365 U. S. 534, 540, 81 Sup. Ct. 735, 5 L. Ed. (2d) 760.

[11] *Gallegos v. Colorado* (1962), 370 U. S. 49, 82 Sup. Ct. 1209, 8 L. Ed. (2d) 325.

[12] *Culombe v. Connecticut, supra.* See also *Crooker v. California* (1958), 357 U. S. 433, 78 Sup. Ct. 1287, 2 L. Ed. (2d) 1448.

[13] *Blackburn v. Alabama* (1960), 361 U. S. 199, 80 Sup. Ct. 274, 4 L. Ed. (2d) 242.

[14] *Lynumn v. Illinois* (1963), 372 U. S. 528, 83 Sup. Ct. 917, 9 L. Ed. (2d) 922.

[15] *Spano v. New York* (1959), 360 U. S. 315, 79 Sup. Ct. 1202, 3 L. Ed. (2d) 1265.

extreme psychological or physical pressure,[16] *e.g.,* depriving the defendant of sleep,[17] have been deemed relevant. In any given case, the final result involves a comparison of pressure with resistance.

In the instant case, the fact that Dona Hoyt was interrogated throughout the night, without being given an opportunity to rest though she requested it, when she was clearly emotionally vulnerable as a result of her recent violent experience (and where the state already had admissions from her on every important point concerning her offense), leads me to the conclusion that the confession was not the product of a free and unconstrained will.

My reason for concluding that her confession was coerced under the totality of circumstances surrounding her confession is well described by the United States supreme court in holding a confession involuntary in the case of *Haynes v. Washington, supra,* at page 519:

"Official overzealousness of the type which vitiates the petitioner's conviction below has only deleterious effects. Here it has put the State to the substantial additional expense of prosecuting the case through the appellate courts and, now, will require even a greater expenditure in the event of retrial, as is likely. But it is the deprivation of the protected rights themselves which is fundamental and the most regrettable, not only because of the effect on the individual defendant, but because of the effect on our system of law and justice. Whether there is involved the brutal 'third degree,' or the more subtle, but no less offensive, methods here obtaining, official misconduct cannot but breed disrespect for law, as well as for those charged with its enforcement."

[16] *Brown v. Mississippi* (1936), 297 U. S. 278, 56 Sup. Ct. 461, 80 L. Ed. 682. *Leyra v. Denno* (1954), 347 U. S. 556, 74 Sup. Ct. 716, 98 L. Ed. 948.

[17] *Chambers v. Florida* (1940), 309 U. S. 227, 60 Sup. Ct. 472, 84 L. Ed. 716.

My objection to the majority analysis is that it looks to the pressure side of the equation alone, and suggests that interrogation after counsel has urged silence in and of itself may be sufficient to exclude a resulting confession. I do not agree with the majority's conclusion that Dona Hoyt was denied a federal constitutional right in this respect, especially since the United States supreme court has expressly held that total denial of *any* contact by the defendant with counsel by the police during interrogation does not in and of itself render a confession coerced, if the defendant had sufficient ability to resist pressure without aid of counsel at this point.[18]

