STATE, Appellant, v. PIRES, Respondent.

*No. State 57. Argued September 12, 1972.—Decided October 5, 1972.*
(Also reported in 201 N. W. 2d 153.)

598

For the appellant the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondent there was a brief by *Keegan, Polidori & Zablocki* of Milwaukee and oral argument by *Charles F. Polidori.*

CONNOR T. HANSEN, J. The issue presented on this appeal is whether the inculpatory statements of the defendant were seized in violation of the fourth amendment of the United States Constitution and art. I, sec. 11, of the Wisconsin Constitution. The trial court found that the statements came into the possession of the police as a result of an unconstitutional search. The resolution of the issue requires a review of the facts upon which the trial court based its findings and determinations.

November 10, 1970, Robert Pires, husband of the defendant, came home from work about 5 p. m. and in the bedroom found the defendant lying across the bed. Also on the bed was his infant child who was cold and appeared dead. He testified he thought his child had died from a fall and that his wife was having a nervous breakdown. His wife had been under psychiatric care, and he first called her psychiatrist, then his brother, and finally he called for a police ambulance. He told the police his baby was dead and his wife was having a nervous breakdown. The police ambulance arrived shortly before 5:30 p. m., and took Pires, his wife, and the infant to the hospital. The

officers with the ambulance took no items from the house. Pires gave no one else permission to enter the dwelling or remove anything from it. When the ambulance left, no one remained in the home.

Lieutenant Halaska testified he was in the Safety Building in Milwaukee at about 5:20 p. m. when he received a police radio dispatch to go to the defendant's address because of a report that there was supposedly the body of a child and a semiconscious woman in the dwelling. When he arrived at the home, he observed no activity. Very shortly a police squad with two uniformed police officers arrived. They all went to the front door, rang the doorbell, received no response and found it locked. Halaska then stationed one of the officers at the front door and he and the other officer proceeded to the back door. They knocked on the door, received no response and, upon finding the door unlocked, entered the premises. They immediately began a search of the house for victims or someone responsible for the victims. They first went to the kitchen and then to the bedroom. Their search produced no one and they did not observe the inculpatory statements of the defendant that were lying on a stand near the bed.

Sometime very shortly after this search of the premises, it appears, Halaska somehow learned that the defendant and the child were at the hospital. About 5:40 p. m. Detective Schreiber arrived at the residence. Schreiber testified that Halaska and the two uniformed officers admitted him through the front door of the premises. He was told by these officers that the apparently dead child and the defendant, both apparent victims of an overdose of drugs, had been conveyed to the hospital from the bedroom. After this conversation, the officers all went into the bedroom and while in the bedroom they observed a clipboard on a nightstand next to the bed with a pad of paper. Examina-

tion revealed that the top four pages were the inculpatory statements of the defendant which are the subject of this appeal. The officers took possession of these writings.

Halaska's testimony is somewhat ambivalent. In response to an inquiry by the court, he testified he knew nobody was in the bedroom after the first search and that there was no further reason for him to make a further search of the room. Later, however, he testified that the first search was done rather quickly and, therefore, a second search was necessary. Halaska further testified that he had no knowledge that the police ambulance had arrived and departed until after the search. He does not identify what he means by the use of the words "the search." If he is referring to the first search of the premises, his testimony can be reconciled with that of Schreiber. If Halaska is referring to the completion of the second search, his testimony is in conflict with that of Schreiber.

The trial court determined that the officers, without a search warrant, had a legitimate reason to enter and search the premises for victims. As to the second search, the trial court, in effect, found that once the officers had determined no victims were in the bedroom they had no constitutional right to conduct a second warrantless search. The trial court determined the note was not in plain view and in order for the officers to see it they had to be searching for evidence and not victims. The trial court, therefore, found the second search to be unconstitutional and entered an order suppressing the evidence obtained on the second search of the premises.

It has been held that credibility of police officers and others testifying at a hearing outside the presence of a jury relating to the voluntariness of defendant's incriminating statements is a question for determination

by the trial court. *Madkins v. State* (1971), 50 Wis. 2d 347, 184 N. W. 2d 144. Also, we have held that when a trial court has made detailed findings of fact in connection with a confession, review of evidentiary or historical physical facts will be limited to the same review used in other factual disputes heard and determined by a trial judge. The findings of the trial court will not be upset unless they are against the great weight and clear preponderance of the evidence. *State v. Carter* (1966), 33 Wis. 2d 80, 90, 91, 146 N. W. 2d 466.

On appeal, the same standards apply for review of an order suppressing evidence. In the case now before us, we are of the opinion that the findings of the trial court were not against the great weight and clear preponderance of the evidence.

However, in prosecuting this appeal, the state presents several arguments in support of its right to seize the inculpatory writings.

One contention advanced by the state is that under the facts of this case, an "emergency" existed and, therefore, the warrantless search of the dwelling fell within one of the "well-delineated situations" justifying such a search.

*Coolidge v. New Hampshire* (1971), 403 U. S. 443, 454, 455, 91 Sup. Ct. 2022, 29 L. Ed. 2d 564, holds:

"Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' . . ."

The search of a dwelling presents a different situation than the search of a movable vehicle. From *Carroll v. United States* (1925), 267 U. S. 132, 153, 45 Sup. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, we find there is:

". . . a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

The "emergency doctrine" or "exigent-circumstance rule" is founded upon the actions of police which are considered reasonable. The element of reasonableness is supplied by the compelling need to assist the victim or apprehend those responsible,[1] not the need to secure evidence.

The trial court found that the initial intrusion into Pires' dwelling was justified under this doctrine. We agree. The fact that, in reality, no one was in the dwelling, does not alter the justification for the initial entry.

In *State v. Davidson* (1969), 44 Wis. 2d 177, 170 N. W. 2d 755, the police officers observed blood on the outside door and large quantities of blood and broken glass inside the house. This court held the police officers' warrantless intrusion reasonable. However, a warrantless entry into the dwelling three days later for a further search was held to be unconstitutional.

In *State v. Hoyt* (1964), 21 Wis. 2d 284, 297, 128 N. W. 2d 645, the police officers received a telephone call reporting a shooting at the Hoyt residence. The

[1] *United States v. Jeffers* (1951), 342 U. S. 48, 72 Sup. Ct. 93, 96 L. Ed. 59; *McDonald v. United States* (1948), 335 U. S. 451, 69 Sup. Ct. 191, 93 L. Ed. 153; *Root v. Gauper* (8th Cir. 1971), 438 Fed. 2d 361.

police officers received no answer to their knocks on the door but observed through the window a body on the floor. This court held:

"In the instant case the purpose of assisting the victim if still alive supplied a compelling reason for immediate entry, quite apart from the purpose of prosecuting for crime. . . .
"We conclude that in the present case the officers lawfully entered the home and their observations incidental to lawful entry did not constitute an unreasonable search."

The difficulty in applying the exigent-circumstance rule to the instant case comes into focus as a result of the second intrusion into the bedroom. Halaska testified he did not see or observe the writings on the first examination of the bedroom. It appears he knew the baby and its mother were at the hospital before the officers made the second visit to the bedroom. Most important, however, is the fact that he testified that after his first entry into the Pires' bedroom, he knew nobody was in the bedroom and there was no reason to make further inquiry into the bedroom.

Therefore, if the seizure of the inculpatory writings is to escape the taint of unconstitutionality, the rationale of the exigent-circumstance rule, applicable to the first warrantless entry of the bedroom, must somehow be extended to the second entry of the bedroom. Under the facts of this case, we cannot justify the second entry under this rule.

A search, lawful at its inception, may become unlawful by broadening its intensity and scope unless further steps are taken that can independently satisfy constitutional requirements.[2]

---

[2] *Terry v. Ohio* (1968), 392 U. S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889; *United States v. Small* (D. C. Mass. 1969), 297 Fed. Supp. 582.

In speaking of the constitutional protections served by the warrant, the court in *Coolidge, supra,* page 467, stated:

". . . The second, distinct objective is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the 'general warrant' abhorred by the colonists, and the problem is not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings. *See, e.g., Boyd v. United States,* 116 U. S., at 624–630; *Marron v. United States,* 275 U. S. 192, 195–196; *Stanford v. Texas,* 379 U. S. 476. The warrant accomplishes this second objective by requiring a 'particular description' of the things to be seized."

The sole justification for the warrantless search in the present case is the need to aid victims or to apprehend those who may be responsible. A search resting upon this rationale must be confined in scope to an intrusion reasonably designed to discover the victims or those who may be responsible. The second intrusion into the Pires' bedroom was not directed to either of those objectives.

Reasonableness of the search is, in the first instance, a substantive determination to be made by the trial court from the facts and circumstances of the case.[3] The trial court, after hearing all the testimony and observing the demeanor of the witnesses, stated that he did not believe that the police officers went back into the bedroom the second time to look for a body but believed they were searching for evidence. The record supports such a determination.

After the officers had determined no one was present, victim or otherwise, the application of the "emergency

[3] *Ker v. California* (1963), 374 U. S. 23, 33, 83 Sup. Ct. 1623, 10 L. Ed. 2d 726; *Blefare v. United States* (9th Cir. 1966), 362 Fed. 2d 870, 871; *Huguez v. United States* (9th Cir. 1968), 406 Fed. 2d 366.

rationale" terminated. Any further search beyond this point, unless further steps are taken to independently satisfy constitutional mandates, is unconstitutional. In the event authorities concluded further search was necessary, a search warrant should have been obtained. The dwelling was vacant; it could have been sealed off; and there was no evidence of any articles which were contraband or stolen or dangerous in themselves. We find no compelling reason as to why the authorities should not have secured a search warrant before conducting the second search.

The state also contends that the inculpatory documents were seized under the "plain view" doctrine. It is true that in some instances evidence in "plain view" of the authorities may be lawfully seized without a search warrant. *Coolidge v. New Hampshire, supra; Milburn v. State* (1971), 50 Wis. 2d 53, 183 N. W. 2d 70; *State v. Davidson, supra; Edwards v. State* (1968), 38 Wis. 2d 332, 156 N. W. 2d 397.

However, any evidence seized will at some time be in the "plain view" of the one who is seizing it. The problem is to identify the circumstances where "plain view" has legal significance. The United States Supreme Court, in *Coolidge, supra,* page 465, recently stated:

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal."

"Plain view," alone, is never enough to justify a warrantless seizure. The court in *Coolidge, supra,* page 468, held:

"The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view *alone* is never enough to justify the warrantless seizure of evidence. This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' . . ."

Police officers must be rightfully in position to have that view. They may not maneuver themselves to achieve the "plain view." This court, in *Milburn, supra,* page 58, quoting from *Harris v. United States* (1968), 390 U. S. 234, 236, 88 Sup. Ct. 992, 19 L. Ed. 2d 1067, has stated:

" 'It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.' "

The doctrine of "plain view" merely supplements the prior justification for the initial intrusion. The court, in *Coolidge, supra,* page 466, held:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. . . ."

In addition, we are of the opinion that the documents were not in "plain view" as the rule is generally understood and applied. The officers did not even see the documents on the first search of the bedroom. It was only after the officers were satisfied no one was in the room and were making the second search that they

first observed the documents. Even then, only after Halaska picked the documents up and read them did he realize their contents. It was then that the inculpatory statements were seized.

The fourth amendment of the United States Constitution and art. I, sec. 11, of the Wisconsin Constitution, guarantee security in one's home from unreasonable search and seizure. The test to be applied, in determining whether a search is constitutional, is one of reasonableness under the peculiar facts and circumstances presented in each case.[4] Warrantless searches are per se unreasonable. Recently the United States Supreme Court, in *Vale v. Louisiana* (1970), 399 U. S. 30, 34, 90 Sup. Ct. 1969, 26 L. Ed. 2d 409, held:

". . . our past decisions make clear that only in 'a few specifically established and well-delineated' situations, *Katz v. United States*, 389 U. S. 347, 357, may a warrantless search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation. . . ."

Under the circumstances present in this case, when a man comes home from work and finds his wife and infant child in the condition of these victims, it cannot be said that the telephone call to the police ambulance for emergency service constituted consent, either before or after the emergency service has been afforded, to an unlimited warrantless search of his dwelling.

---

[4] "In determining what constitutes an unreasonable search and seizure we must also consider the peculiar facts and circumstances presented in each case." *Alston v. State* (1966), 30 Wis. 2d 88, 95, 140 N. W. 2d 286. *See also: State v. Davidson, supra; Edwards v. State, supra; Browne v. State* (1964), 24 Wis. 2d 491, 129 N. W. 2d 175, 131 N. W. 2d 169.

The order of the trial court sustaining the motion to suppress the evidence is affirmed.

*By the Court.*—Order affirmed.

ROBERT W. HANSEN, J. *(dissenting).* A wide variety of situations can produce a telephone call from a citizen to a police department requesting the dispatch of a police ambulance. However, most will fall into one of two categories:

(1) *Report of accident.* Here the telephone call provides no reasonable basis for believing that a crime has been committed. Example: A homeowner telephones the police to state that his wife has suffered an apparent heart attack and that an ambulance is required to convey her to a hospital. Responding to such call, the police come on a mission of mercy only. They may make observations while serving as stretcher-bearers taking the wife from bed or floor to the ambulance. But that is all. There is neither consent nor reasonable basis for a contemporary search of the premises.

(2) *Report of crime.* Here the telephone call provides a reasonable basis for believing that a crime has been committed. Example: A homeowner telephones the police to state that his wife has been raped and cruelly beaten and that an ambulance is needed to take her to a hospital. Responding to such telephoned request, the police are given a dual invitation and assignment: (1) To aid the victim; and (2) to investigate for evidence that may lead to the identification and apprehension of the rapist. Both entry and investigation are authorized by direct invitation, express or implied, of the homeowner making the telephone call.

The disagreement on this appeal is in what category the husband's telephone call is to be placed. The writer, and colleagues joining in this dissent, would place it in the second category, *i.e.,* a report of probable crime

rather than a report of accident. When he telephoned the police, the husband told them that, when he came home from work, he found the body of his child, cold and lifeless, and his wife, completely unconscious, lying side-by-side on a bed in the bedroom. That either or both had been the victim of foul play was an entirely reasonable conclusion to make, based on the report given. That the husband was reporting the probable commission of a crime is an entirely reasonable summary of the information he furnished to police. So the police dispatched both an ambulance and an investigatory squad to the premises. This was not only proper police procedure; it is exactly what they were invited to do by the report given by the husband who clearly had the right to invite or consent to search.[1]

When the police arrived at the home of the person making the telephone call, they entered, not only by consent, but at the invitation of the homeowner. They entered, and had the right to enter, for two purposes: (1) To secure hospital attention for the unconscious wife and apparently lifeless child; and (2) to investigate circumstances surrounding the condition of the wife and death of the child. Priority was given to taking the wife and child by ambulance to a hospital. That was entirely appropriate, for the saving of human life is entitled to the highest priority. After the ambulance had left, the police officers returned twice to the bedroom and on the second occasion observed, in plain view on a nightstand at the bedside, the notes to which

[1] *Embry v. State* (1970), 46 Wis. 2d 151, 174 N. W. 2d 521, holding where two persons have equal rights to use of premises either may give consent to search and evidence discovered can be used against either. *See also: Mears v. State* (1971), 52 Wis. 2d 435, 190 N. W. 2d 184. In addition, *see: State ex rel. Van Ermen v. Burke* (1966), 30 Wis. 2d 324, 140 N. W. 2d 737, authorities not required to inform accused of right to refuse to consent to search.

objection is now made. As to objects in plain view, the question is whether the officers had the right to be in the position to have that view.[2] We would hold that the officers, by consent and invitation of the home-owner, had the right to stand where they stood when they saw what they saw.

The majority opinion finds the police taking of the notes that were in plain view on the nightstand to be improper. Apparently, the majority views the husband's telephone call as solely a request for an ambulance, unaccompanied by a report of a situation calling for and requiring police investigation of the circumstances. If no more had been involved than his reporting he had found his wife unconscious on the bed, this inter-pretation of the telephone call might hold up. But the husband also informed police that alongside the un-conscious body of his wife lay the cold and apparently lifeless body of his child. The unconscious wife and dead child, side-by-side on the bed, make accident (such as the wife's taking too many sleeping pills by mistake or the child's happening upon a bottle of iodine in a medicine chest) an unlikely explanation of what had happened. The husband's report to police was a report that a crime had likely been committed. Such report required and authorized police investigation.[3]

---

[2] "It is established law that '. . . objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evi-dence.'" *State v. Davidson* (1969), 44 Wis. 2d 177, 195, 170 N. W. 2d 755, quoting *Harris v. United States* (1968), 390 U. S. 234, 236, 88 Sup. Ct. 992, 19 L. Ed. 2d 1067. *See also: Milburn v. State* (1971), 50 Wis. 2d 53, 58, 183 N. W. 2d 70, upholding seizure of evidence from automobile because ". . . officers had the right to be in the position from which they viewed the objects within the car. . . ."

[3] The majority opinion notes that, before telephoning the police, the husband first called the wife's psychiatrist and then his brother. This might suggest that he suspected that his wife had

The majority opinion rests the police entry in the bedroom, not upon consent or invitation, but upon "exigent-circumstance rule," [4] meaning required by the circumstances then and there present. The majority agrees with the trial court that the ". . . initial intrusion into Pires' dwelling was justified under this doctrine." However, the majority holds the "second intrusion into the Pires' bedroom" was not justified by the circumstances then exigent. This makes two police visits to the bedroom, separated by minutes, into two separate searches. This we would not do. If the police had a right to check or search the bedroom at all, as we see it, they had a right to recheck it. It is true that in one case this court upheld a contemporaneous search, but found tainted a second search, three days later. [5] But that was three days later. Here, if the officers had the right to check the bedroom, we would hold they had the right, some minutes later, to recheck it.

Finding consent and invitation as the basis for the police being in the bedroom, first time or second, we do not reach or need the exigent-circumstance rule. If we did, we would not limit it, as does the majority opinion, to ". . . the compelling need to assist the victim or apprehend those responsible, not the need to secure evidence." If the crime were rape, the circumstances exigent would not merely justify looking for another rape victim in the bedroom or to see if the rapist was hiding under the bed or in a closet. Criminals may return to the scene of their crimes on occasion, but they

committed the crime of taking the life of the child, but would not negative the likelihood a crime had been committed.

[4] " '. . . that the exigencies of the situation made that course imperative.' " *Coolidge v. New Hampshire* (1971), 403 U. S. 443, 455, 91 Sup. Ct. 2022, 29 L. Ed. 2d 564, quoting *McDonald v. United States* (1948), 335 U. S. 451, 456, 69 Sup. Ct. 191, 93 L. Ed. 153.

[5] *State v. Davidson, supra,* at pages 194, 195.

usually leave promptly after the crime has been completed. The police would have the right and duty to seek telltale clues which are in plain view and have been left behind by the perpetrator of the crime. Apprehension of a criminal is more often accomplished by discovering what he has left behind than by discovering that he has stayed behind.

Of course, as the majority opinion points out, search, lawful in its inception, may become unlawful if its scope or intensity are broadened.[6] We see neither scope nor intensity broadened by stepping back into a bedroom to check or recheck it. Nor would we attach to the departure of the ambulance the importance given it in the majority opinion. If the husband, as we would hold, reported the probable commission of a crime in his home, the coming or going of the ambulance does not affect the consent given to the police to investigate circumstances surrounding the situation reported.

We would not consider important, or even relevant, the conclusion that the police, before entering the bedroom again, ". . . knew the baby and its mother were at the hospital." If this fact is at all controlling, the suggestion is that police officers complete their investigation before the ambulance leaves. Minutes are precious when it comes to saving lives. Police officers are entitled, and, as we see it, required to give priority to getting those in need of medical attention to the hospital. Having accomplished that task, they may resume their search.

It may well be, in light of the majority holding, that, upon receipt of a telephoned request from a homeowner for the dispatch of an ambulance to his home, reporting a situation that makes it reasonable to believe that a crime has been committed, the police are now required

---

[6] Citing *Terry v. Ohio* (1968), 392 U. S. 1, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889; *United States v. Small* (D. C. Mass. 1969), 297 Fed. Supp. 582.

to ask, "Are you requesting that we investigate what has happened?" Given the predictable affirmative response, the invitation to enter and investigate the circumstances surrounding the incident would be express, not implied. We see no reason for requesting an express authorization where, as in the case before us, consent to investigate can be reasonably implied from the husband's report to the police. We would reverse the trial court's order which held inadmissible the notes observed and taken from the bedstand by the police, and we would find the police procedure followed in this case absolutely appropriate and completely correct.

I am authorized to state that Mr. Justice BRUCE F. BEILFUSS and Mr. Justice LEO B. HANLEY join in this dissent.