STATE, Plaintiff in error, v. GUMS, Defendant in error.

*No. State 183. Argued June 5, 1975.—Decided June 30, 1975.*
(Also reported in 230 N. W. 2d 813.)

514

For the plaintiff in error there were briefs by *Bronson C. La Follette,* attorney general, and *Robert D. Martinson* and *William L. Gansner,* assistant attorneys general, and oral argument by *Mr. Gansner.*

For the defendant in error there was a brief and oral argument by *Patrick R. Doyle* of La Crosse.

ROBERT W. HANSEN, J. The "exclusionary rule" is that, where constitutional guaranties have been invaded, derivative evidence cannot be introduced against an accused at trial.[1] The rule has its critics.[2] It is a sanc-

[1] *Michigan v. Tucker* (1974), 417 U. S. 433, 445, 94 Sup. Ct. 2357, 41 L. Ed. 2d 182, the high court stating (fn. 19) : "In *Wong Sun* [*Wong Sun v. United States* (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. 2d 441] the police discovered evidence through statements made by the accused after he had been placed under arrest. This

tion to deter future unlawful police conduct.[3] Its purpose is to prevent, not to repair.[4] However, the rule does not mean that whenever the constable errs the criminal goes free. The law does not require that policemen in the performance of their official duties make no errors whatsoever.[5] Such an expectation would be unrealistic.[6] The

Court, finding that the arrest had occurred without probable cause, held that the derivative evidence could not be introduced against the accused at trial."

[2] *See: Conrad v. State* (1974), 63 Wis. 2d 616, 635–637, 218 N. W. 2d 252, this court stating: ". . . the penalty that is assessed by the invocation of the exclusionary rule is not an assurance that there will be no police misconduct, it is merely an assurance that society will be penalized by its inability to use relevant evidence to punish crimes committed against society and the state.

". . .

". . . The exclusionary rule does not protect their [those who are innocent] privacy. Its purpose, though noble, is simply not effectuated when it can only be made to apply against society for the benefit of the arguably guilty." (Opinion by Mr. Justice NATHAN S. HEFFERNAN with Mr. Justice HORACE W. WILKIE and Mr. Chief Justice E. HAROLD HALLOWS disagreeing with the dicta criticizing the exclusionary rule.)

[3] *Michigan v. Tucker, supra,* footnote 1, at page 446, the high court holding: "We have recently said, in a search-and-seizure context, that the exclusionary rule's 'prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.' " (Quoting *United States v. Calandra* (1974), 414 U. S. 338, 347, 94 Sup. Ct. 613, 38 L. Ed. 2d 561.)

[4] *Id.* at page 446, the court stating: " 'The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " (Quoting *Elkins v. United States* (1960), 364 U. S. 206, 217, 80 Sup. Ct. 1437, 4 L. Ed. 2d 1669.)

[5] *Id.* at page 446, the court stating: "Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever."

[6] *Id.* at page 446, the court continuing: "The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic."

deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful or, at the very least, negligent conduct which has deprived a defendant of a constitutional right.[7] The court that authored the exclusionary rule has said of it: "Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."[8] Thus, as to any given set of facts, we are directed by the high court that the exclusionary rule requires: "Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose."[9]

In the case before us the issue is whether the exclusionary rule requires the suppression of evidence seized under a search warrant, issued on the basis of observations made by police officers in the kitchen and living room of the defendant. No question as to a search or searching is involved. There was no search here.[10] The contraband observed was in plain view of the officers or of anyone who happened to be in the kitchen or living room. Rather the claim is that the officers had no right to stand where they stood when they saw what they saw.[11] An ancient Sioux Indian proverb suggests:

[7] *Id.* at page 447.

[8] *Id.* at page 447.

[9] *Id.* at page 446.

[10] *Moline v. State* (1972), 53 Wis. 2d 662, 668, 193 N. W. 2d 874, this court holding: "This court has defined a search as an examination of one's premises or person that '. . . implies exploratory investigation or quest,' and also, '. . . implies a prying into hidden places for that which is concealed.'" (Quoting *State v. McCarty* (1970), 47 Wis. 2d 781, 786, 177 N. W. 2d 819, in turn citing *Haerr v. United States* (5th Cir. 1957), 240 Fed. 2d 533, 535; and *id.* at page 786, in turn citing *Edwards v. State* (1968), 38 Wis. 2d 332, 338, 156 N. W. 2d 397, and *State v. Dombrowski* (1969), 44 Wis. 2d 486, 495, 171 N. W. 2d 349.)

[11] *See: Harris v. United States* (1968), 390 U. S. 234, 236, 88 Sup. Ct. 992, 19 L. Ed. 2d 1067, the high court holding: "It has long been settled that objects falling in the plain view of an

"Judge no man until you have walked in his moccasins for three moons." In that spirit we will retrace the steps taken by the law officers from police station to kitchen and living room, and review the defendant's challenges to each of the steps taken as to its propriety and reasonableness under the circumstances.

*Police at the station.* At police headquarters the two detectives were given the assignment of apprehending and placing in custody one John Rice. The mandate to arrest was contained in a probation violation warrant, issued by the administrator of the division of corrections of the state department of health and social services, charging that John Rice had absconded from probation supervision and directed that he be arrested and placed in custody. Defendant sees the two officers as dispatched to make a warrantless arrest, analogizing their situation with that of police officers dispatched to go to a house because of a report that the body of a dead child and semiconscious woman were in such house.[12] The analogy

---

officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." (Quoted and followed in *Milburn v. State* (1971), 50 Wis. 2d 53, 183 N. W. 2d 70.)

[12] *State v. Pires* (1972), 55 Wis. 2d 597, 602, 610, 201 N. W. 2d 153, affirming trial court's distinguishing between the two searches conducted in defendant's home, this court stating: "The trial court determined that the officers, without a search warrant, had a legitimate reason to enter and search the premises for victims. As to the second search, the trial court, in effect, found that once the officers had determined no victims were in the bedroom they had no constitutional right to conduct a second warrantless search. The trial court determined the note was not in plain view and in order for the officers to see it they had to be searching for evidence and not victims. The trial court, therefore, found the second search to be unconstitutional and entered an order suppressing the evidence obtained on the second search of the premises." *Id.* at page 602.

"The order of the trial court sustaining the motion to suppress the evidence is sustained." *Id.* at page 610.

will not hold. True it is that the two detectives here were not serving a criminal warrant, charging a citizen with the commission of a crime. But they were serving a probation violation warrant, charging one earlier convicted of crime and placed on probation with having broken the conditions of his probation.[13] The mandate to the officers was identical: To apprehend and place in custody the person named in the warrant. As to risks likely to be encountered, including the chance of escape and danger of violent resistance, there is no basis for believing them to be less in placing a probation violator in custody than in placing an accused under arrest. Given information that John Rice was in a house occupied by the defendant, the two officers left the station and proceeded to her home.

*Police at the door.* Arriving at the home, one detective stationed himself at the rear door and one knocked on the front door. Three minutes later, an occupant, Maggie Colleran, answered the knock. (Defendant was not home at the time and did not arrive home until after the search warrant was issued and illegal drugs seized.) The detective showed his badge, identified himself and asked if John Rice was there. The lady who answered the knock said that she thought so, and said, "Just a minute. . . ." A voice shouted from inside

[13] *See:* Sec. 973.10 (2), Stats., providing: "(2) If a probationer violates the conditions of his probation, the department may order him brought before the court for sentence which shall then be imposed without further stay or if he has already been sentenced, may order him to prison; and the term of the sentence shall begin on the date he enters the prison. A copy of the order of the department shall be sufficient authority for the officer executing it to take the probationer to court or to prison. The officer shall execute such order as a warrant for arrest, but any officer may, without order or warrant, take the probationer into custody whenever necessary in order to prevent escape or enforce discipline or for violation of probation."

". . . yes, he's upstairs." The door was closed, and the detective heard sounds of people moving about rapidly. Fearing an escape attempt, the detective ordered that the door be opened, and was informed by the lady that the door was open and unlocked and that "We are waiting for him to come down." The detective stepped across the threshold. Defendant claims that the detective was not entitled to enter the house to arrest John Rice. Given the probation violation arrest warrant, and the exigent circumstances of reason to believe that an escape might be attempted, the detective had the right to enter the home only if he had ". . . probable cause to believe that the suspect will be found on the premises."[14] Here the detective clearly had probable cause to believe that John Rice was inside the house. If he never had it before, he had probable cause to so believe by reason of the information given him by the lady who answered the door. We agree with the trial court finding that here entry into the house was proper, warranted and reasonable.

*Police on the stairs.* When the detective entered the house, he started up the stairs. There were at the time a half-dozen or so persons either on the stairs, at the foot of the stairs or at the top of the stairs. A man started down the stairs, stating that his name was John Rice. Those present, including the detective's partner, went to the foot of the stairs. As the arresting officer

[14] *See: Fisher v. Volz* (3d Cir. 1974), 496 Fed. 2d 333, 341, 342, the court there stating: "We therefore hold that police officers may not constitutionally enter the home of an innocent citizen in search of a suspected offender for whom they have a valid arrest warrant, even under exigent circumstances, unless they also have probable cause to believe that the suspect will be found on the premises." *See also: Rodriguez v. Jones* (5th Cir. 1973), 473 Fed. 2d 599, 606; *United States v. Brown* (D. C. Cir. 1972), 467 Fed. 2d 419, 423; and *United States v. McKinney* (6th Cir. 1967), 379 Fed. 2d 259, 263.

testified, "We come down to the foot of the stairs and it's kind of congested right there with seven people and two detectives." The officer testified that the space at the foot of the stairs was five or six feet square, "Not wide enough to contain nine people." So the officer directed those present to go to the immediately adjacent kitchen. This room was four to five feet from the doorway, or, as the officer testified, ". . . you take three steps and you're in the kitchen." Defendant claims this moving of the group into the kitchen was an unreasonable intrusion or extending of the entry. Under these circumstances, we hold that it was not. The officer gave as the reason for moving from the crowded foot of the steps to the kitchen, "Because it was easier to keep an eye on everybody and it wasn't congested." That is an adequate and sensible reason for moving nine persons from a crowded space at the foot of a stairway into an immediately adjacent room. Compression increases volatility of crowds and gases. Convenience, comfort of those crowded together, and control of the situation make entirely prudent and proper the move to the room that was three steps away.

*Police in the kitchen.* Once in the kitchen, one of the detectives asked the man who had stated his name to be John Rice to give some proof of his identity. The officers did not know John Rice so the inquiry was appropriate. The man who identified himself as John Rice could furnish no identification—no driver's license, no social security card, no credit card or identification of any kind. Asked "Do you have some identification somewhere to prove that you are John Rice?" the man being questioned answered, "No." At this point in time and space, the police officers determined to seek additional information to verify that the person who stated his name was John Rice was the John Rice named in the probation violation warrant. Defendant argues that

they then ". . . had no articulate facts to say they had the wrong man. . . ." That may be true, but it is also true that they had no facts corroborating the individual's self-identification of himself as John Rice. Should they leave with the wrong person, the true fugitive's escape might be facilitated.[15] The officers were entitled to take into consideration the possibility of a suit for damages in a civil action for false imprisonment based on a failure to make reasonable inquiry as to the identity of the person placed under arrest.[16] On the right of the police under appropriate circumstances to detain a person for interrogation, our court has held that it is " 'the essence of good police work' to briefly stop a suspicious individual 'in order to determine his identity or to maintain the status quo momentarily while obtaining more informa-

[15] See: Soehle v. State (1973), 60 Wis. 2d 72, 75, 76, 208 N. W. 2d 341, upholding right of police to interrogate defendant and a companion who had driven up and parked their car near a residence in which a large quantity of illegal drugs had been found the night before, this court holding: "Under these circumstances it was entirely reasonable for the two police officers to stop and interrogate defendant and companion to determine their identity," adding, as to officer's request that defendant show his driver's license: "Either for purpose of identification or to determine if the defendant had operated a motor vehicle without a license, the police officer was entitled to include in the interrogation a request to be shown a driver's license by the person he had observed driving the car."

[16] Strong v. Milwaukee (1968), 38 Wis. 2d 564, 566, 157 N. W. 2d 619, where this court did not reach the question of whether a complaint for negligent confinement, premised upon a good-faith action of a police officer, stated a cause of action against a municipality, but noted: "Plaintiff further contends that the officer performed his required duty in good faith, but simply arrested the wrong Michael Strong.

"The complaint does not reflect such rationale."

See also: Wallner v. Fidelity & Deposit Co. (1948), 253 Wis. 66, 33 N. W. 2d 215.

tion.' "[17] In view of the entire absence of corroborating proof of a self-identification, we hold it entirely reasonable for the police officers here to seek to verify that the person who stated his name was John Rice was, in fact, the John Rice named in the probation violation warrant. The right of the police to verify information given them and to seek such verification before proceeding is to be recognized and encouraged, rather than limited and discouraged.[18]

*Police on the telephone.* Still in the kitchen, and not moving from the kitchen, the detectives decided to telephone police headquarters. The purpose of the call was to secure additional information about the person named in

[17] *State v. Williamson* (1973), 58 Wis. 2d 514, 518, fn. 3, 206 N. W. 2d 613, quoting *Adams v. Williams* (1972), 407 U. S. 143, 145, 92 Sup. Ct. 1921, 32 L. Ed. 2d 612, the high court holding: " 'The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [*Terry v. Ohio* (1968), 392 U. S. 1, 23, 88 Sup. Ct. 1868, 20 L. Ed. 2d 889] recognizes that it may be the essence of good police work to adopt an intermediate response.' "

[18] *See: State v. Beaty* (1973), 57 Wis. 2d 531, 538, 205 N. W. 2d 11, upholding right of police officers to stop and question defendant who, in post-midnight hours, cut through backyards peering or peeking around the corners of houses before proceeding, in an area in which there had been a rash of break-ins: "Such suspicion-engendering activities warranted and, in fact, dictated that the defendant be stopped and questioned about his activities. As the United States Supreme Court said in *Terry*, '. . . It would have been poor police work indeed for an officer . . . to have failed to investigate this behavior further.' " (Citing *Terry v. Ohio, supra,* footnote 17, at page 23.) *See also: Molina v. State, supra,* footnote 10, at page 678, on right of police to seek verification of details of information reported to them before proceeding, our court holding: ". . . [s]eeking such verification or 'corroboration' [before proceeding] was proper, prudent and indeed a to-be-preferred procedure." (Citing *State v. Paszek* (1971), 50 Wis. 2d 619, 184 N. W. 2d 836.)

the probation violation warrant to use in establishing that the person self-identified as John Rice was the person named in the warrant. They intended to inquire, and did inquire, as to the height, weight, date of birth and middle name of the person named in the warrant. At this point one of the officers asked the resident or live-in baby-sitter, Renee Carraux, whether there was a telephone available and whether he could use it. The baby-sitter answered, "Yes," and pointed out where the telephone was—at one side of the kitchen. He made the call, got the information requested and established that the date of birth and middle initial given over the telephone coincided with information given by the person identifying himself as John Rice. Defendant's counsel argued that the police officers were required here to go, presumably with John Rice in tow, to their squad car parked outside, and make the telephone call from there. That was not necessary. There is a human tendency, shared by police officers, to seek to use the nearest telephone when a call has to be made. Here that nearest telephone was in the very room where the officers were standing, and there was no reason why it should not have been used. This is particularly so because the live-in baby-sitter must be presumed to have the minimal authority required to grant permission, in the absence of her employer, to someone on the premises to use the telephone.[19] With consent given and no issue

[19] As to the right of occupant to give consent to an actual search of the premises, *see: Embry v. State* (1970), 46 Wis. 2d 151, 159, 174 N. W. 2d 521, this court holding: "We think it well established that where two persons have equal rights to the use or occupancy of premises either may give consent to a search and the evidence thus disclosed can be used against either of them." *See also: Holt v. State* (1962), 17 Wis. 2d 468, 117 N. W. 2d 626; *United States v. Sferas* (7th Cir. 1954), 210 Fed. 2d 69; *United States v. Reed* (7th Cir 1968), 392 Fed. 2d 865. *See also: Mears v. State* (1971), 52 Wis. 2d 435, 440, 190 N. W. 2d 184, this court holding: "We

as to authority of the baby-sitter to give such consent here raised, the detective was entitled to use the telephone. Even if he intended only to telephone his wife to tell her that he would be late for dinner, he would be so entitled, for it is the fact of permission granted, not the purpose of the call, that assures the entitlement.

*Police observing drugs.* While the one detective was on the telephone, the other detective was standing across the kitchen with his shoulder against the refrigerator. He was a tall man, taller than his partner. The refrigerator came up to the chins of the two detectives. Entirely inadvertently, with no claim or intimation of any manipulation of circumstances to achieve the viewing, the detective leaning against the refrigerator saw, in clear view, a small dish on top of the refrigerator. On the dish was a small plastic bag containing a chunk of brown substance which, from his prior contacts with the drug, he recognized to be hashish. Also in the dish or bowl, near the hashish, was ". . . what looked like a homemade brass bowl, . . . the type used generally for smoking marijuana." Under these circumstances, the detectives could have seized the hashish and brass pipe, for the seizure would have been ". . . the result of a 'plain view' inspection by an officer, who had the legal justification to be where he was at the time of its sighting."[20] However, instead, the detectives telephoned police headquarters to report what they had observed, and a search warrant was issued and the substance and pipe observed were seized under the search warrant.

see the mother-son relationship here only as a fact or factor supportive of the finding that the mother was a person having rights at least equal to those of the defendant to the use and occupancy of the Mears home. It is her right to use and occupy that gives validity to her consent to the search."

[20] *State v. Taylor* (1973), 60 Wis. 2d 506, 516, 210 N. W. 2d 873.

While the search warrant was not here required to validate the seizure, we do not fault the police officers for taking this additional precaution to insure the validity of the seizure.

*Police in the living room.* When the two detectives and seven persons were in the kitchen, one of the detectives recognized one of those present as a person whom he knew and whom he knew not to be John Rice. The detective suggested to this person that he might leave the kitchen and sit in the living room while the question as to identity of the person named in the probation violation arrest warrant was being resolved. After the contraband on top of the refrigerator had been observed, the detective who had told his acquaintance, Phil Conrad, that he could sit in the living room, went to the living room ". . . more or less to say hi, what are you doing. You tell me you're straight and you're sitting around here. What are you doing, you smoking this stuff?" Returning to the kitchen, he observed, also in plain view, a packet of a brown substance he recognized to be hashish. The plastic bag containing the hashish was on top of the television set. The search warrant issued was not limited to the kitchen; it commanded the officers to search ". . . the said premises for the said things." However, with the observation of the hashish in plain view in the kitchen being made by the detective at a time and place when he had the right to make such observation, there was a valid basis for the issuance of the search warrant. At the most, the subsequent observation of contraband on top of the television set in an adjacent room did no more than add an alternative basis for issuance of the search warrant. While the walk to the living room to talk to the person sitting there involved no search or attempt to search, what met the officer's view during the return to the kitchen does not reach back to erode or affect the valid basis for seizure

or issuance of a search warrant established by the plain-view discovery of the contraband on top of the refrigerator in the kitchen.

Additionally, defendant contends that the search warrant here must be invalidated and all evidence seized under it suppressed because false information was furnished to the magistrate by the police officer who applied for the warrant. It does appear that the magistrate was informed that the police had been given false information by one Renee Carraux at the door of defendant's home. The fact is that the detective was met at the door by Maggie Colleran, not by Renee Carraux, and that what Maggie Colleran told the officer at the door could not fairly be described as false information. With the information relayed to the magistrate by the officer who talked on the telephone with the officers at the scene, the opportunity for error was maximized. However, the information that was in error was here entirely immaterial to the issuance of the search warrant. It was what was found in the kitchen, not what was said at the door or by whom, that supported the issuance of the search warrant. Who answered the knock on the door or what she said could here make no material difference. Where, absent the false information furnished, there remain facts sufficient to support the magistrate's finding of probable cause, we would not reverse on the basis of factual error in the information furnished the magistrate by the officer seeking the search warrant. We find the search warrant here to be valid and properly issued. We further note our holding that the police officers here were not required to seek and secure a search warrant for the valid seizure of contraband in their plain view when they had a right to be where they were when they saw what they saw. Where a search warrant was not needed at all, a successful attack upon the issuance of such search warrant would not lead to the

suppression of the evidence that could have been seized without such warrant.

Having retraced the steps taken by the police officers and having reviewed the challenges to each such step taken, we conclude that the police procedures followed in this case were prudent, proper and entirely reasonable under these circumstances. We find the two detectives assigned to serve the probation violation warrant to have acted in complete good faith, and to have committed no error. The exclusionary rule is not here available or applicable. There is no "fruit of the poisonous tree" to exclude for the reason that there is no poison in this tree.[21] There are here present neither illegal actions by the police nor evidence to which objection is made that results from exploitation of an illegality.[22] The search warrant issued and the evidence seized resulted from contraband falling in the plain view of the police officer who had a right to be in the position to have that view. They were subject to seizure and may be introduced into evidence. The order of the trial court to the contrary, ordering evidence secured under the search warrant suppressed, is reversed with directions to the trial court to deny defendant's motion to suppress evidence.

*By the Court.*—Order reversed and cause remanded for further proceedings consistent with this opinion.

HEFFERNAN, J. *(dissenting).* The majority opinion vindicates an unconstitutional intrusion upon private

[21] *Wong Sun v. United States* (1963), 371 U. S. 471, 83 Sup. Ct. 407, 9 L. Ed. 2d 441.

[22] *Id.* at pages 487, 488, the high court holding: ". . . that [not] all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality . . . .'" Cited, quoted and followed in *State v. Taylor, supra,* footnote 20, at page 517.

premises. In this case, the two police officers came to arrest John Rice, a probation violator. According to the record, they came armed with no information whatsoever but the name of the person they sought and the belief, the source of which is unknown, that he was to be found in the residence of the defendant, Norma Jane Gums.

Putting aside for the moment the question of the scope of authority given to a police officer who seeks to execute an administrative warrant for the arrest of a probation violator, it appears from the record that there was no prior evidence of probable cause to enter the Gums home. However, the police officers, when they arrived at the residence, stated their identity and asked if John Rice was there. They eventually received the response that he was and that he was upstairs. They were asked to wait a minute. At this point, the officers had probable cause to believe that John Rice was inside. Had Rice come to the door forthwith, stepped out, and stated he was John Rice, the officers' mission would have been at an end and there would have been no occasion to cross the threshold of the Gums household. The limited purpose for which they came would have been accomplished. They were duty bound to make the arrest under the administrative warrant and leave the premises forthwith. Officer Abraham, however, stated to the baby-sitter in charge of the home that either Rice should come out or he would kick the door down. The police officers were told, "We are waiting for him to come down," and that the door was unlocked.

When Officer Abraham came through the door, he immediately started up the stairway, and a male person started down the stairway. Abraham asked the man if he was John Rice. That person acknowledged that he was. At that point, the function of the police officers was at an end. They had come for the purpose of seizing John

Rice, and they had done so. It was their duty to leave the premises immediately.

Rice, however, did not have any identification, and thereafter the police officers persisted in attempting to identify Rice by something other than his own admission. In so doing, they intruded, without authorization and without any probable cause whatsoever, upon private premises. The police officers herded the occupants of the house into the kitchen on the ground that it was too congested in the hallway. The congestion would have been reduced by three had the two police officers promptly left with Rice in their custody. There was no authority for the officers to tell the other occupants of the house to move to the kitchen or to follow them there. The officers make the lame excuse that it was necessary to call the police headquarters to get additional information so they could identify Rice.

While in the kitchen, one of the officers saw, on the top of a refrigerator, a substance later determined to be hashish. No doubt, the hashish was in the plain view of the officer who saw it, but he had no right to be in that portion of the premises.

The majority opinion states that the exclusionary rule is not for the purpose of repairing a police intrusion, but is rather for the purpose of imposing a sanction upon officers of the state to deter future unlawful police conduct "and thereby effectuate the guarantee of the Fourth Amendment."

The conduct here was unlawful, and future conduct of the same type should be deterred because it is unreasonable. When full information is available, it is unreasonable for police officers, having only knowledge of the person's name, to attempt to make an arrest of a wanted person. Because the police were not adequately prepared to make the arrest, because they had not undertaken the elementary step of securing an avail-

able description of the wanted person, they went to the home of Norma Gums and there intruded upon her premises, made an unlawful search, and without cause curtailed the liberty of other persons on the premises. There was no probable cause to believe any person on the premises other than the man who so identified himself was John Rice. That is the kind of conduct that the fourth amendment seeks to deter. Any reasonable police officer should know when he sets out to make an arrest that he ought to have facts which will enable him to identify the suspect. These facts were readily available at police headquarters and were ascertained by one telephone call.

The state argued that it was necessary, despite Rice's admission of his identity, to further ascertain that he was the person wanted, because of the possibility of false arrest charges. It is indeed farfetched to believe that any possible civil action would lie when the person arrested told the police that he was the wanted fugitive. The argument that the police officers were protecting themselves against a possible action for false arrest is specious. While the police officers have the right to identify a person before they take him into custody—and in all cases should do so—this information was at their disposal before they set out to make the arrest.

The majority opinion justifies incompetent and unprofessional police work, which occasioned an unconstitutional intrusion into the home of a person not sought on the warrant. Moreover, after the hashish was seen in the kitchen, one of the officers wandered into the living room, apparently to chat with a person he knew, and there discovered another plastic bag containing contraband. No justification for this intrusion is even attempted. It is apparently the position of the majority that, once an appropriate initial entry has been made, the entire home is subject to a roving inspection.

The police officers in this case had no prior justification to be in the kitchen or in the living room. The trial judge properly suppressed the fruits of this unlawful intrusion into a citizen's home.

It should be mentioned that, in the final analysis, the majority opinion justifies the initial entry on the ground that the officers were told by the baby-sitter that John Rice was present. We do not disagree with the conclusion that probable cause for a limited entry was established at that point. However, since the majority buttresses their finding of probable cause on this information obtained at the scene, it is clear that their discussion of the authority given under an administrative order to pick up a probationer is mere dicta. I do not believe that a probation warrant gives the same power to one executing it as does a constitutional warrant for arrest. The fourth amendment to the United States Constitution provides in part:

". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, *and the persons* or things *to be seized.*" (Emphasis supplied.)

Under that constitutional mandate, arrest warrants must be issued by neutral and detached magistrates. *United States v. United States District Court* (1972), 407 U. S. 297, 316, 92 Sup. Ct. 2125, 32 L. Ed. 2d 752; *Coolidge v. New Hampshire* (1971), 403 U. S. 443, 449, 91 Sup. Ct. 2022, 29 L. Ed. 2d 564; and *State ex rel. White v. Simpson* (1965), 28 Wis. 2d 590, 598, 137 N. W. 2d 391. Under these cases, it has been held that an executive officer of the government—in *Coolidge,* the attorney general, and in *United States v. United States District Court,* the president—were not neutral and detached magistrates, who could issue a warrant. In *United States v. United States District Court,* page 317, the United States Supreme Court said:

"The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government."

Accordingly, the probation violation warrant issued by the administrator of the state division of corrections was not a constitutional warrant, and an officer executing such warrant had only the authority to bring the person before the correction authorities. Officers are not clothed with the broad scope of power that is vested in a police officer when there has been a judicial predetermination of probable cause to arrest.

Since the ultimate authority to make the entry was on the basis of the information received on the scene, the scope of the power of an officer executing an administrative warrant is not an issue in this case. We merely point out that the question of what powers are given to a police officer who serves an administrative pickup warrant is not to be disposed of conclusively by the majority's summary dicta—particularly in a case where the probable cause for the entry was made upon information not furnished by the complaint or warrant.

The majority has approved of incompetent and unprofessional police practices. It is such ill-advised and unplanned police forays into the privacy of others that *Tucker*, relied upon by the majority, seeks to deter. The majority opinion takes the position that a police officer, armed with ignorance, can rummage through a home and look through its rooms to secure the information which he should have had before any attempt was made to execute the warrant. In this case, it was not merely a matter of "what you don't know doesn't hurt you," but what the police officers did not know, in the majority's view, apparently gave them leave to conduct an examina-

tion of the premises which they would not have had the right to do if they had complied with the fourth amendment standard that requires a person subject to arrest to be described "particularly."

The trial judge properly suppressed the evidence. I would affirm.

I am authorized to state that Mr. Chief Justice WILKIE and Mr. Justice DAY join in this dissent.