STATE, Respondent, v. MONAHAN, Appellant.†

*No. 75–537–CR.   Argued January 4, 1977.—*
*Decided March 15, 1977.*
(Also reported in 251 N. W. 2d 421.)

† Motion for rehearing denied, without costs, on May 17, 1977.

For the appellant there were briefs by *Jacobson, Sodos & Melnick, S.C.* and oral argument by *David A. Melnick,* all of Milwaukee.

For the respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

BEILFUSS, C. J.   On the evening of January 20, 1975, federal narcotics agents received a phone call from a confidential informant who stated a sale of 500 pounds of marijuana could be arranged. The informant then had Richard Hills speak with the agent. Hills stated the "deal" could not be arranged until January 21, 1975. The informant was instructed to contact Hills on the following day. The informant contacted the agents the next morning, stating the marijuana would be taken to Hills' farm between noon and 1 p.m. The agents traveled from Milwaukee to Hills' farmhouse in Dodge county, arrived at 12:15 p.m., and established surveillance. A meeting between Hills and the agents was arranged. During the 5 p.m., meeting at the "This Place" tavern in Watertown, Hills stated that 200 "Thai sticks" would

be delivered to the farmhouse at 7:30 p.m., and that he was to meet the party who was to deliver the marijuana at 9 p.m. "Thai sticks" are small bamboo shoots filled with marijuana and laced with opium. The agreed price for these Thai sticks was $21 per stick. The persons who were to deliver the marijuana and the Thai sticks were different people. Hills returned to his farmhouse; shortly after 7:30 p.m., he left and went to the Riverview Bar where he was to meet the agents. Hills stated that the "Thai sticks" had been delivered and the person who delivered them was waiting alone at the farmhouse. En route to the farmhouse Hills stated that this person did not want to meet anyone.

Upon arriving at the farmhouse, Hills, the informant and two agents entered. They passed through a limited area in the kitchen. Hills directed the three men into a den. He told the agents not to go into the living room; however, as they entered the house both agents observed the defendant-appellant, Thomas Monahan, seated in the living room. Following a discussion Hills left the den, went through the kitchen and into the living room. Following Hills into the kitchen, one agent observed Hills remove a bag from underneath a couch in the living room directly to the left of where Monahan was seated. In the den the sticks were counted, and after it was ascertained that there were 200, the bag with the sticks in it was returned to the hiding place in the living room. One agent left to get $4,200 from another agent waiting in the car while Hills brought the sticks back into the den. When the agent returned, both Hills and Monahan were arrested.

It was later discovered that the sticks were not laced with opium, but contained only marijuana and hashish.

Monahan brought a motion to suppress the evidence because it was obtained by an illegal search and seizure. The motion was denied on September 30, 1975. The original felony charge of possession with intent to de-

liver was amended on October 8, 1975, to possession of marijuana, a misdemeanor. Monahan pled guilty to this charge and was placed on probation for one year on December 15, 1975. As conditions of probation, Monahan was to spend 90 days in jail under Huber provisions, pay costs and a fine of $100. The condition imposing 90 days in the county jail was stayed pending appeal.

The basic issue agreed upon by Monahan and the state is whether the visual surveillance of the living room, where the agents saw Hills remove a bag containing marijuana-hashish sticks from under the couch and identified Monahan, was a search in the constitutional sense.

" ' "A search implies a prying into hidden places for that which is concealed." ' . . .

" 'A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term [search] implies exploratory investigation or quest. . . .' " *State v. McDougal,* 68 Wis.2d 399, 405, 228 N.W.2d 671, 674 (1975).

"A search can be conducted by one's eyes alone." *Edwards v. State,* 38 Wis.2d 332, 338, 156 N.W.2d 397, 401 (1968).

The agents were invited by Hills into his house. Implicit in this invitation is a right to look around. Any observations that they made as they entered were not a search. Observations made in this way were not a "prying into hidden places." Once in the house the agents were directed to the den and instructed not to go into the living room. After a discussion concerning price of the sticks, Hills left the den and went to the living room. One agent followed Hills as far as the kitchen where he observed Hills in the living room removing the sticks from under a couch directly to the left of where Monahan was sitting. Monahan's claim is essentially the same as that presented in *State v. Gums,* 69 Wis.2d 513, 517,

230 N.W.2d 813, 815 (1975): "[T]he officers had no right to stand where they stood when they saw what they saw." If the agent was entitled to be in the kitchen and could easily see Hills' activities in the living room, no search took place.[1]

To determine whether a search took place we must answer the question whether the undercover agent had a right to be in the kitchen. To answer this question we must examine the conduct of the parties and rely on common sense. When one invites another into one's home the invitation may implicitly extend to all areas of the home or it may be limited to a specific area. The extent of the invitation usually depends upon the relationship of the parties and the particular circumstances of the visit. The door-to-door salesperson invited into the home knows he or she is limited to the room they are brought into. One's family or close friends may understand that they may move freely from room to room.

There was no statement that the agents were not to enter the kitchen. Did this mean they were entitled to enter the kitchen without invitation from Hills or in his absence? We do not believe so. The conduct of Hills demonstrates that the agents were to remain in the den. He specifically directed them to this room. He gave no indication that the agents were entitled to roam at will, on the contrary he stated they were not to go into the living room. The conduct of the agents is also of assistance in answering this question. The agent who entered the kitchen to view the living room did not do so with Hills. He waited until Hills was in the living room before entering the kitchen; he knew he was not

[1] See Molina v. State, 53 Wis.2d 662, 668–69, 193 N.W.2d 874, 877 (1972), cert. denied, 407 U.S. 923; State v. Davidson, 44 Wis. 2d 177, 194–95, 170 N.W.2d 755, 764 (1969); Edwards v. State, 38 Wis.2d 332, 338, 156 N.W.2d 397, 401 (1968).

to be in the kitchen to make observation into the living room. When the agent followed Hills into the kitchen he was on an "exploratory investigation" examining Hills' premises with a view to the discovery of contraband or evidence of guilt. In looking into the living room the agent was prying into hidden places for that which is concealed. We conclude that the entry into the kitchen and the visual surveillance of the living room was a search.

Having determined that a search took place, the issue becomes whether the search was circumscribed by either the Fourth Amendment to the United States Constitution or Art. I, sec. 11 of the Wisconsin Constitution. *State v. Davidson,* 44 Wis.2d 177, 194 (n. 12), 170 N.W.2d 755, 764 (1969). The Fourth Amendment requires searches and seizures be reasonable. *State v. Tarrell,* 74 Wis.2d 647, 653, 247 N.W.2d 696, 700 (1976), citing *State v. Bell,* 62 Wis.2d 534, 539–40, 215 N.W.2d 535, 539 (1974) : "The fundamental rule applicable to searches and seizures is that warrantless searches are per se unreasonable under the Fourth Amendment except under certain well-defined circumstances." *Id.* There was no warrant to search Hills' house. If this warrantless search is to be found reasonable it must fall within one of the "specifically established and well-delineated exceptions" to the warrant requirement.[2]

Before examining these exceptions we note that there are recognized distinctions in the appropriate levels of protection afforded by the Fourth Amendment to different forms of intrusion. *Wendricks v. State,* 72 Wis.2d 717, 722, 242 N.W.2d 187, 190 (1976). The highest level of protection is afforded to a dwelling place. *See State v. Pires,* 55 Wis.2d 597, 604, 201 N.W.2d 153, 157 (1972).

---

[2] *Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1972).

Contraband in plain view,[3] consent,[4] lawful arrest,[5] exigent circumstances,[6] hot pursuit[7] or a "stop and frisk"[8] present circumstances which may justify an exception to the warrant requirement.

A warrant is unnecessary if contraband is in plain view. But the plain view doctrine does not apply when an officer does not have a right to be in the place where he viewed the contraband. *State v. Spraggin*, 71 Wis.2d 604, 610, 239 N.W.2d 297, 304 (1976). Even if the agent had authority to be in the kitchen, plain view would not apply because plain view requires that discovery of the object be inadvertent. *State v. O'Brien*, 70 Wis.2d 414, 419 (n. 2), 234 N.W.2d 362, 364 (1975). The agent neither had authority to be in the kitchen nor was the view of the contraband being removed while Monahan was present inadvertent.

This case is unlike *State v. O'Brien, supra,* where police officers went to a farmhouse to execute an arrest warrant. In the process they obtained marijuana which was in plain view in the kitchen and which was in plain view in a third floor closet which was checked for hidden persons. There was no challenge to the right of the officers to be in the kitchen. This court found the police officers had the right to be on the third floor to locate, for interrogation purposes, all persons present concerning ownership of the contraband. In this case, because the narcotics agent was not entitled to be in the kitchen in the manner he was, the plain view exception does not apply.

---

[3] *Id.* at 465.

[4] *United States v. Matlock*, 415 U.S. 164, 169 (1974).

[5] *Ker v. California*, 374 U.S. 23, 34 (1963).

[6] *Chambers v. Maroney*, 399 U.S. 42, 51 (1970).

[7] *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967).

[8] *Terry v. Ohio*, 392 U.S. 1, 16–20 (1968).

*State v. Gums, supra,* also concerned police proceeding to a home to execute a warrant. The mandate to arrest was contained in a probation violation warrant. After arriving at the home, police believed an escape attempt probable and this exigent circumstance entitled them to enter. There was no room to conduct an investigation at the foot of the stairs inside the entryway because of the number of people present, so the officers moved everyone to the kitchen. While in the kitchen one detective inadvertently saw hashish on top of the refrigerator. Other contraband was found by another officer in plain view, and a search warrant was obtained. Again, in this case, there was no warrant; no exigent circumstances were present, and because the view of Monahan and the marijuana was not inadvertent the plain view doctrine does not apply.

The state argues that because the agents had consent to enter the residence they committed no illegal act in entering the kitchen and that once in the kitchen they could look where they pleased. It argues Monahan had no reasonable expectation of privacy while sitting in the living room. This argument begs the question. As noted above, the agent did not have consent to enter the kitchen for the purpose and manner he did. Without consent, or some other exception which would justify the search, the entry into the kitchen and the subsequent search was illegal.

The entry into the kitchen and visual search of the living room was not a search incident to lawful arrest. The search took place prior to the arrest; it was unrelated to the actual arrest. One rationale for permitting warrantless searches incident to arrest is the expectation that the arrestee may attempt to destroy incriminating evidence. *Cupp v. Murphy,* 412 U.S. 291, 295 (1973). If there had been an indication that Hills was going to

destroy the evidence, the search would have been permissible. But there was no such indication.

In many cases the exigency of the situation, the circumstances of the moment, demand a search without a warrant. Examples are when vehicles can be readily moved, the defendants might take flight, or that evidence of illegal contraband might be moved or destroyed. *Milwaukee v. Cohen*, 57 Wis.2d 38, 46, 203 N.W.2d 633, 638 (1973). Another example is the need to assist a victim or apprehend those responsible for the crime. *State v. Pires, supra* at 606, 201 N.W.2d at 157. No such urgency was present here. There was no need for the agent's entry into the kitchen to apprehend an escaping criminal, prevent a crime or seize the contraband.

The agents arrived at Hills' farmhouse at 12:15 p.m. At that time they had information that a crime was going to be committed. Further developments throughout the afternoon reinforced this information. A search warrant could have been obtained. They chose not to seek issuance of a warrant. Rather, they relied on their ability as undercover agents to gain the confidence of the suspects. Through subterfuge, they gained admittance to the house and were presented with the illegal drugs. This is a valid police technique, but any search which takes place must be reasonable under the circumstances. *Edwards v. State, supra* at 340, 156 N.W. 2d at 402. Under the circumstances the entry into the kitchen was not reasonable. There were no exigent circumstances justifying the entry and a warrant had not been obtained. "Belief, however well founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause." *Agnello v. United States*, 269 U.S. 20, 33 (1925). And

well founded belief that contraband is in another room of the dwelling house furnishes no justification of entry into that room absent a warrant. The agents knew in advance that a crime was to be committed. To allow them to forego obtaining a warrant and then conduct a search once inside the premises violates the protection of the Fourth Amendment.

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade the privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals." *McDonald v. United States,* 335 U.S. 451, 455–56 (1948).

"[W]here the discovery is anticipated, where the police know in advance the location of the evidence and intent to seize it, the situation is altogether different [from a plain view seizure]. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as *'per se* unreasonable' in the absence of 'exigent circumstances.' " *Coolidge v. New Hampshire, supra* at 470–71.

Because the discovery was anticipated, a warrant or circumstances which justified a search without a warrant were necessary to validate the entry into the kitchen and subsequent visual search of the living room. Neither a warrant nor those circumstances were present, therefore the search was constitutionally invalid.

To hold that the search was unconstitutional does not mean that all evidence obtained that evening should have been suppressed. Only the fruits of the illegal search should have been suppressed. This was the identifica-

tion of Monahan sitting directly to the left of the couch as the bag containing the marijuana and hashish was removed by Hills. Monahan argues that the marijuana and hashish were products of an illegal search. This is not true. Hills voluntarily brought the marijuana and hashish into the den in the presence of the agents. Unaware they were police officers, he thought he was making a routine sale of an illegal substance. This evidence was not "seized" and there is no need to suppress it. Seizure implies a taking or removal of something from the possession of another.[9] Additionally, there is no question that the agents' original viewing of Monahan in the living room as they entered the house, shortly before they obtained the contraband, was not a product of the search.

On oral argument two questions arose which were not presented in the briefs. The first was whether Monahan had standing to contest the search of Hills' home. We are convinced that he had such standing.[10] The second was whether, on remand, the district attorney could re-issue the original charge of possession of marijuana with intent to deliver, a felony, even though the appeal was from a misdemeanor conviction. Supplemental briefs were submitted on this issue. A stipulation was filed stating that if there was a reversal and remand Monahan would not be prosecuted for the more serious charge which was dismissed as a part of the plea agreement. Although there is conflicting authority on whether

[9] *Molina v. State*, 53 Wis.2d 662, 668–69, 193 N.W.2d 874, 877 (1972). *See also State v. Killory*, 73 Wis.2d 400, 416, 243 N.W.2d 475, 485 (1976).

[10] *Jones v. United States*, 362 U.S. 257, 261 (1960); *State v. Mabra*, 61 Wis.2d 613, 619–623, 213 N.W.2d 545, 547–550 (1974); *State v. Christel*, 61 Wis.2d 143, 211 N.W.2d 801 (1973).

the more serious charge could be reissued[11] prior to receiving the stipulation, we were inclined to hold that the more serious charge could be reissued. The stipulation has mooted this question. We do not, therefore, make a determination on this issue.

The state suggests that a harmless error rule be formulated to apply where a defendant is appealing pursuant to sec. 971.31(10), Stats. It is suggested that such a rule will further the interests of judicial economy. We have considered this argument, but we do not adopt such a rule.

Testimony that the agent saw the marijuana being removed from under a couch while Monahan was sitting near the couch must be suppressed. Neither the contraband taken when the arrest was made nor testimony that the agents saw Monahan in the house as they entered need be suppressed.

*By the Court.*—Judgment reversed and cause remanded for further proceedings consistent with this opinion.

ROBERT W. HANSEN, J. *(dissenting)*. In this case federal narcotics agents set out to make a "buy" and to make a "pinch." The "buy" was to be the purchase of illegal drugs. The "pinch" was to be of the persons making the sale. Purchase made, arrest would follow.

Time, price and place of sale were set in advance. One Richard Hills informed a federal agent that the agent

[11] *Compare Rivers v. Lucas,* 477 F.2d 199 (6th Cir. 1973), and *Mullreed v. Kropp,* 425 F.2d 1095 (6th Cir. 1970) with *United States v. Anderson,* 514 F.2d 583 (7th Cir. 1975). *Anderson* rejected the rationale of *Rivers* and *Mullreed* and held that a more serious charge could be reissued after a conviction on a guilty plea was overturned. *See also North Carolina v. Pearce,* 395 U.S. 711 (1969), and *Blackledge v. Perry,* 417 U.S. 21 (1974), concerning the due process aspects of reissuing a more serious charge.

could buy 500 pounds of marijuana. Hills set the date for such sale as January 21, 1975. Hills set the place of sale as his farmhouse in Dodge county. On the morning of the 21st, Hills informed a federal informant the marijuana would be moved to his farmhouse between 12 noon and 1:00 p.m. that same afternoon.[1] That afternoon Hills gave the informant a sample of the marijuana to be sold and stated that 200 "Thai Sticks"[2] could also be purchased. Hills then asked for a meeting with the undercover agents that evening at 5:00 p.m.

At that meeting held in a tavern, Hills informed the agents the 200 "Thai Sticks" would be delivered to his farmhouse at 7:30 p.m. that evening. At 7:45 p.m., in a different tavern, Hills told the agents the "Thai Sticks" had been delivered to the farmhouse and that the supplier was waiting for them there. Hills then told the agents the supplier was anxious to "do the deal," but "did not want to meet anyone." Hills and the agents then drove to the farmhouse to make the purchase.

Upon arrival one of the agents showed Hills $9,000 in cash. One agent stayed outside with the money. Hills, two agents and the informant entered the kitchen. From the kitchen both agents observed the defendant sitting in the living room. Hills, the two agents and the informant then went into a side den room. Whereupon Hills "requested" the agents not to go into the living

[1] Shortly after the meeting with Hills, federal agents set up a stationary surveillance of the farmhouse. Arriving there at approximately 12:15 p.m., they observed a red van truck exiting from the driveway. At approximately 2:15 p.m. a light colored foreign car arrived at the farmhouse. A female carrying a bag exited the car and entered the farmhouse. The bag corresponded in approximate size and color to the bag subsequently given by Hills to the agents which contained illegal contraband.

[2] "Thai Sticks" are small bamboo shoots with compressed marijuana mixed with opium gum. Here it was subsequently ascertained that the "sticks" involved consisted of compressed marijuana and hashish.

room where defendant was sitting, having earlier told the agents that defendant did "not want to meet anyone."

Hills was asked to get the "Thai Sticks" so that the agents could count the 200 "sticks" to be purchased. Hills went to the living room to get the "sticks." One agent then went back to the kitchen where he had been before and where he had earlier observed the defendant. Through the open door he observed Hills pick up a bag which he took to the den. Once in the den Hills displayed the contents of the bag to the agents and counted out 200 "sticks." The agents advised him they would buy the 200 "sticks." Whereupon one agent left the farmhouse to get the money needed for the purchase from the agent who stood outside ($4,200 was to be used to purchase the 200 "Thai Sticks" just displayed by Hills and counted by the agents). The agent returned with the money needed.

At this point one federal agent went into the living room, advised defendant he was a law officer and that defendant was under arrest for violation of the narcotics laws. Simultaneously the other federal agent advised Hills he was a federal law officer and placed him under arrest for violation of the narcotics laws.

The sole challenge to defendant's conviction of the offense of possessing a controlled substance, to wit, marijuana,[3] relates to denial by the trial court of defendant's pretrial motion to suppress both the contraband and the physical observation of the defendant made by the arresting officers. While defendant pleaded guilty, he is entitled by statute to appeal the denial of a motion to suppress.[4]

The basis of the challenge revolves around the actions of one of the two agents who, when Hills went into the living room to bring the "sticks" to the agents for counting, stepped back into the kitchen—where he had been

---

[3] Contrary to secs. 161.41(3), 161.14(4)(k) and 939.61, Stats.
[4] Sec. 971.31(10), Stats.

before—and looked through an open door. That agent then saw defendant in the living room and saw Hills get the closed bag which he was to bring to the agents in the den. Defendant claims the officer's looking into the living room from the kitchen made identification of the defendant and possession of the 200 "sticks" the "fruit" of an unconstitutional search and seizure. There are four reasons, each one of them sufficient, why the claim of this defendant is without merit.

*RIGHT TO ARREST DEFENDANT.* Under the circumstances here, at the time the federal agent stepped into the kitchen, he had not only the right to look into the living room, but also the right to *go* into the living room and arrest both Hills and defendant. The statute in this state provides that a law enforcement officer may arrest a person when "[t]here are reasonable grounds to believe that the person is committing or has committed a crime."[5]

This court has held that probable cause to arrest is present if the facts and circumstances known to the police officer warrant a prudent man in believing an offense has been committed.[6] The United States Supreme Court has held that probable cause to arrest without warrant exists where " 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."[7]

In the case before us reasonably trustworthy information came from the seller Hills. The defendant was identified by Hills as the supplier, present in an adjoining

---

[5] Sec. 968.07 (1) (d), Stats.

[6] *Leroux v. State,* 58 Wis.2d 671, 683, 207 N.W.2d 589 (1973), citing *Kluck v. State,* 37 Wis.2d 378, 389, 155 N.W.2d 26 (1967).

[7] *Draper v. United States,* 358 U.S. 307, 313 (1959), quoting *Carroll v. United States,* 267 U.S. 132, 162 (1925), cited in *Leroux v. State, supra,* at 683.

room, of the contraband. Here all that went before, the facts and circumstances leading up to the presence of the seller, supplier and purchasers in the farmhouse, would compel any prudent man to believe that defendant and Hills were in the next room—in possession of illegal narcotics—with intent to sell and deliver.

Since reasonable grounds existed for the agent to believe that Hills and the defendant were in possession of narcotics (with Hills having gone to the room for the purpose of getting the contraband from defendant and counting out 200 "sticks"), the agent in the kitchen was fully warranted in proceeding into the living room and placing under arrest both defendant and his business associate, Hills. The agent is not to be faulted for only looking when he was entitled to do far more than look. To only look when one is entitled to arrest raises no problem of constitutional dimensions.

*RIGHT TO INVESTIGATE CRIME.* When Hills headed for the living room to get the illegal "sticks," the agent who went to the kitchen had the right to keep Hills under observance—to continue investigation of the crime being committed. In addition to the right to arrest for probable cause, law enforcement officers have the right, if not duty, to investigate where there is reason to believe a crime has been or is being committed.[8] Our court has stated: "Certainly the police may investigate claims of crime on evidence not sufficient to justify

[8] *See: State v. Beaty,* 57 Wis.2d 531, 538, 205 N.W.2d 11 (1973), where, in a case involving a stop to question a suspect, this court held as to reasons for suspecting commission of a crime, "Such suspicion-engendering activities warranted and, in fact, dictated that the defendant be stopped and questioned about his activities. As the United States Supreme Court said in *Terry* [*Terry v. Ohio,* 392 U.S. 1, 23 (1968)] '. . . It would have been poor police work indeed for an officer . . . to have failed to investigate this behavior further.'" Keeping a suspect engaged in the commission of a crime under observation is as essential to proper investigation as stopping to question.

an arrest."[9]   The test as to such police investigation is whether the investigation is "constitutionally reasonable under the circumstances."[10]   Such seeking of verification or "corroboration" has been termed by this court to be "prudent, proper and entirely reasonable."[11]

Here with all terms and conditions of an illegal sale agreed upon and the money ready to be paid over, the seller went to the living room for the sole purpose of securing and returning with the narcotic drugs.  When he returned to the den the 200 "sticks" were to be counted in the presence of the agents.  Since this was the sole reason for the seller's trip to the living room, it was an entirely proper and entirely reasonable investigatory police procedure to keep seller Hills under observation as he went to and returned from the living room. The fact that grounds for arrest of seller and supplier,

[9] *Browne v. State*, 24 Wis.2d 491, 507, 129 N.W.2d 175, 131 N.W.2d 169 (1964).

[10] *Id.* at 508, this court adding at 508, 509: "If police conduct is not considered unreasonable in the circumstances, it is not made unreasonable if it is deemed to have involved a civil trespass." The court in *Browne* concluded: "In the case at bar, and considering the nature of the crime involved, the police conduct in presenting themselves at the rooming house after receiving the phone call, in identifying themselves as police officers, in being ushered by the fellow roomer to the kitchen, in asking as to the whereabouts of Browne, and in viewing him through the open door, constituted a reasonable investigation on the part of the police officers that warranted any invasion of privacy Browne suffered from having the officers brought to the threshold of his room without his affirmative consent."

[11] *See: State v. Gums*, 69 Wis.2d 513, 528, 230 N.W.2d 813 (1975), this court stating at 517: "The contraband observed was in plain view of the officers or of anyone who happened to be in the kitchen or living room.  Rather the claim is that the officers had no right to stand where they stood when they saw what they saw." In *Gums*, in retracing the steps taken by the police officers from police station to kitchen and living room, the court found no merit to defendant's challenges to each of the steps taken as to its propriety and reasonableness under the circumstances.

sitting in the living room, also then existed does not erode the right of the law officers to keep the seller under observation while he went to fetch the contraband.

*RIGHT OF OFFICER TO BE IN KITCHEN.* On this appeal defendant does not dispute that the officer in the kitchen was entitled to see what anybody in the kitchen could observe. Conceding that what the officer saw from the kitchen was in plain and open view from the kitchen by anyone, defendant argues that, what is necessary for the application of the plain view doctrine, is that the officer must have a right to be where he is when he observes the evidence in plain view. The defendant here contends the officer had no right to be in the kitchen.

Defendant's sole basis that the officer had no right to go back to the kitchen—where he had been before with the seller—is the request made by Hills when he went to the living room to get the contraband "sticks" that the customers waiting to complete the sale not go into the living room. To quote defendant's statement of facts: "Hills requested both Agents Stacy and Hehr not to go into the living room of the house." Earlier, Hills had told the customers-agents "his source did not want to meet anyone."

Defendant thus claims "it is a reasonable inference from the circumstances that when Hills 'directed' the undercover agents to the den, and 'requested' them not to go into the living room, he was implicitly indicating that the agents were to stay in the den." This is one possible inference. At least as reasonable is the inference that Hills meant only for the agents not to go into the living room because the supplier "did not want to meet anyone." Such request was not a request that no visit be made to the kitchen.

This is the inference drawn by the trial judge at the suppression hearing. The lower court here held that "because Hills requested only that the agents not go

into the living room" and did not instruct them to stay in the den, the agent who went back to the kitchen was entitled to be there when he looked into the living room. Where alternative reasonable inferences are available to the trier of fact as to what was "requested" by the seller-landowner as to where the purchasers could or could not wander, the inference drawn by the trier of fact is to be upheld. Neither this court nor the defendant is entitled to substitute a different inference where the one drawn by the trier of fact is eminently reasonable, here the most reasonable.

*NO SEARCH AND SEIZURE.* Under the United States Constitution citizens are to be secure "against unreasonable searches and seizures."[12] In the case before us there was no unreasonable search and no seizure at all. Defendant's brief quotes our court as having said, "A search can be conducted by one's eyes alone." But that quoted sentence is followed immediately with these words: " 'A search implies a prying into hidden places for that which is concealed.' [*People v. Marvin*, 358 Ill. 426, 428, 193 N.E. 202 (1934)] It is not a search to observe what is in plain view. Even though visual surveillance of things within plain view may be regarded as a search the real issue to be settled is whether or not such activities are regarded as an unreasonable search as circumscribed by either the Fourth amendment of the United States constitution or art. I, sec. 11 of the Wisconsin constitution."[13]

Putting aside the officer's right to arrest, right to investigate and right to be in the kitchen, it is mind-boggling to describe the officer's glance into the living room as an unreasonable search or a seizure at all. As to identification of the defendant, the agent saw only the same person he had observed earlier in the same living room from the same kitchen when the owner-

[12] Fourth Amendment, U. S. Const. *See also:* Art. I, sec. 11, Wis. Const.

[13] *Edwards v. State*, 38 Wis.2d 332, 338, 156 N.W.2d 397 (1968).

seller Hills had taken· the agents through that kitchen to the den. As to the contraband, the agent saw only the seller Hills pick up a bag, its contents not apparent to view, and take it to the den. It was in the den, seconds later, that the seller Hills himself opened that bag, displaying its contents to the agents and counting out the 200 "sticks" of illegal contraband. What the officers learned of the contents of the bag derived not from a look into the living room but from the opening of the bag by the seller in the den.

Exactly as the trial court found, the fact is that:

"The hashish was not the product of a search or a seizure. It was freely and forthrightly delivered to the agents by Hills as a result of a transaction. The agents did not look for the hashish; it was brought to them and handed to them. They did not seize the hashish; it was placed in their hands in the den where they were told to be by the owner of the house. It was not discovered by any observation of an agent in a place he had no right to be. Such evidence, the rem itself, cannot be suppressed."

The writer would thus uphold the trial court's denial of defendant's motion to suppress, holding that: (1) At the time the officer first looked into the living room on the way to the den, he was entitled to go into the living room and arrest defendant; (2) at the time the officer went into the kitchen he was entitled to keep seller Hills under observation in investigating the crime; (3) under the "request" made by the farmhouse owner Hills, the officer was entitled to step into the kitchen; and (4) there was here no search, certainly no unreasonable search, and here no seizure at all, the contraband being given to the federal agents by Hills as part of the illegal transaction. For these four reasons, any one of which would be sufficient for affirmance, the writer would affirm.

I am authorized to state that Mr. Justice LEO B. HANLEY and Mr. Justice CONNOR T. HANSEN join in this dissent.